UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

In re:

Application of CHEVRON                                    10 MC 00001 (LAK)

This Document Applies to:   ALL CASES
------------------------------------------------------------------- x


### CHEVRON CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A PRESERVATION ORDER, AND TO SUPPLEMENT AND ENFORCE THE SUBPOENAS


GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Attorneys for Applicant Chevron Corporation*

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................. 1

II. FACTUAL BACKGROUND .............................................................................. 5

    A.    The *Crude* Outtakes Show That Plaintiffs' Counsel and Consultants Planned and Created the Supposedly Independent $27.4 Billion "Global Expert Assessment" 5

        1.    On March 3, 2007, Plaintiffs' Counsel and Consultants Met With "Special Master" Cabrera to Plan His "Global Assessment," Two Weeks Before Cabrera Was Appointed by the Court ............................... 6

        2.    On March 4, 2007, Plaintiffs' Counsel and Consultants Admitted That They Had No Actual Evidence of Groundwater Contamination and Planned to Submit Fraudulent Evidence ................. 11

    B.    Plaintiffs' Counsel, Consultants, and Associates Have Made Repeated Misrepresentations About the Fraudulent "Global Expert Assessment" and Their Roles in Planning, Creating and Exploiting It ..................................................... 13

        1.    Misrepresentations Before the Lago Agrio Court.................................... 13

        2.    Misrepresentations Before United States Courts .................................... 15

        3.    Misrepresentations Before the United States Congress and Federal Regulators ................................................................................... 18

        4.    Misrepresentations in the Press.............................................................. 19

III. THE COURT SHOULD ENTER AN EVIDENCE PRESERVATION ORDER................. 21

IV. THE COURT SHOULD AUTHORIZE SUPPLEMENTAL DISCOVERY ....................... 23

    A.    The Supplemental Discovery Is Permissible Under *Gonzales* and the Second Circuit's July 15, 2010 Order.................................................................. 24

    B.    The Supplemental Discovery Is Not Unduly Intrusive or Burdensome ............. 28

V. COURT SHOULD COMPEL COMPLIANCE WITH THE EXISTING ORDERS ............ 29

VI. CONCLUSION................................................................................................ 34

## **TABLE OF AUTHORITIES**

Page(s)

### **Cases**

*Boland v. Town of Newington,*
    No. 3:05-CV-1739, 2007 WL 128915 (D. Conn. Jan. 12, 2007) ............................................ 26

*Carter v. City of New York,*
    No. 02 Civ. 8755, 2004 WL 193142 (S.D.N.Y. Feb. 2, 2004) ............................................... 26

*Cryolife, Inc. v. Tenaxis Med., Inc.,*
    No. C08-05124 HRL, 2009 WL 1229353 (N.D. Cal. May 5, 2009) ...................................... 28

*Gonzales v. National Broadcasting Co.,*
    194 F.3d 29 (2d Cir. 1999) .................................................................................. 24, 26, 27, 28

*HJB, Inc. v. Am. Home Prods. Corp.,*
    No. 93 C 6728, 1994 WL 31005 (N.D. Ill. Feb. 1, 1994) ..................................................... 22

*In re Applic. of Chevron Corp.,*
    __ F. Supp. 2d __, 2010 WL 1801526, at *11 (S.D.N.Y. May 6, 2010,
    as corrected May 10, 2010) ............................................................................ 25, 26, 27, 28, 29

*In re Applic. of Chevron Corp.,*
    No. M-19-111, 2010 U.S. Dist. LEXIS 51578 (S.D.N.Y. May 20,
    2010) ...................................................................................................................................... 25

*In re Applic. of Winning (HK) Shipping Co.,*
    No. 09-22659-MC, 2010 WL 1796579 (S.D. Fla. Apr. 30, 2010) ....................................... 28

*In re Applic. to Quash Subpoenas to Daily News, L.P.,*
    No. M8-85, 2010 WL 2102503 (S.D.N.Y. May 20, 2010) ................................................... 28

*In re Bayer AG,*
    146 F.3d 188 (3d Cir. 1998) ................................................................................................. 29

*In re Ramaekers,*
    33 F. Supp. 2d 312 (S.D.N.Y. 1999) .................................................................................... 26

*In re Trump Hotel Shareholder Derivative Litig.,*
    No. 96CIV.7820, 1997 WL 442135 (S.D.N.Y. Aug. 5, 1997) ............................................. 22

*In re. Applic. of Nat'l Broad. Co.,*
    No. M-77, 1997 WL 33442116 (S.D.N.Y. Aug. 1, 1997) .................................................... 22

*Kronisch v. United States,*
    150 F.3d 112 (2d Cir. 1998) ................................................................................................. 22

*Lonegan v. Hasty*,
  No. CV-04-2743, 2008 WL 41445 (E.D.N.Y. Jan. 1, 2008)................................. 26

*Schmitz v. Bernstein, Liebhard & Lifshitz, LLP*,
  376 F.3d 79 (2d Cir. 2004) ............................................................................. 29

*Turner v. Hudson Transit Lines, Inc.*,
  142 F.R.D. 68 (S.D.N.Y. 1991) ....................................................................... 22

**Statutes**

28 U.S.C. § 1782 ................................................................................ 4, 18, 23, 29, 30

**Other Authorities**

Manual for Complex Litigation (4th ed. 2004) § 11.442 ............................................ 23

**Rules**

Fed. R. Civ. P. 30(b)(6) ................................................................................. 29

## I.      INTRODUCTION

**"Hold on a second, you know, this is Ecuador. . . .  You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want.  Sorry, but it's true."  "Because at the end of the day, this is all for the Court just a bunch of smoke and mirrors and bullshit.  It really is.  We have enough, to get money, to win."**  Ex. F at 195-05.[1]  So says Lago Agrio Plaintiffs' counsel and New York-licensed lawyer Steven Donziger in an outtake from *Crude* produced just days ago pursuant to the orders of this Court and the Second Circuit.  Donziger makes these statements during a meeting with Plaintiffs' U.S. environmental consultants Charles Champ, Ann Maest, and Dick Kamp, after Maest tells him, point blank, that they need evidence of groundwater contamination, because Plaintiffs did not submit any and "right now all the reports are saying it's just at the pits and the stations and nothing has spread anywhere at all."  *Id*.  When Champ continues to press on the lack of evidence, Donziger looks at the camera and says, "There's another point I got to make . . . with these guys, but I can't get this on camera," and then the camera goes off.  *Id*.

Chevron has thus far been able to review only a small fraction of the outtakes produced, but already it is clear that they contain conclusive evidence that Plaintiffs' counsel, consultants, and associates have knowingly participated in a fraudulent enterprise to corrupt the legal proceedings pending in Ecuador against Chevron.  The express goal of their scheme is to procure a fraudulent, multi-billion dollar damages recommendation from a supposedly independent "Special Master," and then to use that fraudulent recommendation either to extort a settlement from

---

[1]  Unless otherwise indicated, all Exhibit references are to the Declaration of Kristen L. Hendricks ("Hendricks Decl."), filed concurrently herewith.  Chevron has submitted as Exhibit F a CD containing the clips discussed in this motion, with English subtitles.  Citations in this brief refer to the clips by their assigned number.  Certified translation of native language transcripts of these clips are provided at Exhibit G.

Chevron or to obtain a fraudulent judgment from the Ecuadorian court.

The outtakes reviewed to date include footage of an extensive March 3, 2007 planning meeting between Plaintiffs' U.S. and Ecuadorian lawyers (Donziger and Pablo Fajardo), Plaintiffs' U.S. and Ecuadorian environmental consultants (including Champ, Maest, and Kamp), representatives of the Amazon Defense Front (Frente de Defensa de la Amazonia or "Frente") and Selva Viva, **Richard Cabrera**, and others.  *See* Hendricks Decl. at ¶¶ 12-27.  This meeting occurred two weeks *before* the Lago Agrio court appointed Cabrera as its "neutral" and "independent" court auxiliary to conduct an "*Examen Pericial Global* " or "*Peritaje Global*" (both translated as "Global Expert Assessment"), but the participants at the meeting *already knew* that the court was going to appoint Cabrera as its Global Expert and referred to him as such.  *See* Ex. F at 189-00-02, 191-00-03.  Donziger, Fajardo, and their associate Luis Yanza of the Frente and Selva Viva, are shown in the footage leading the meeting, with Fajardo presenting a PowerPoint detailing their "*Plan Para el Examen Pericial Global*," i.e., their plans for carrying out the official duties that the court would soon appoint Cabrera to perform.  Although the cameramen obviously attempt to avoid filming Cabrera, he can be seen in the margins of the screen. *Id.*  When the discussion turns to plans for drafting Cabrera's report, Fajardo tells the assembled group that the expert is going to "sign the report and review it.  But all of us . . . have to contribute to the report." *Id.* at 187-01-02-12.  Toward the end of the portion of the meeting shown on film, Donziger brags:  "We could jack this thing up to $30 billion . . . in one day." *Id.* at 193-00-01.

These outtakes show that Plaintiffs' counsel, consultants, and associates colluded *from the very beginning* to have Cabrera appointed and to then have the allegedly neutral "Special Master" adopt their bogus, multi-billion dollar damages claims and present them to the Ecuadorian court and the world as his own.  Plaintiffs' counsel, consultants, and associates have falsely

proclaimed Cabrera's "independence" and cited his fraudulent damages assessment (along with their own, fraudulent "peer review" of the assessment they ghostwrote) in submissions before the United States Congress and other official bodies.  They have concealed and misrepresented their illicit relationship with Cabrera and their tampering with his testimony, and they have obstructed any judicial inquiry into their conduct by falsely representing to the Ecuadorian court and to multiple United States courts that Cabrera was independent, and then by proffering a series of misleading and outright false justifications when evidence of their misconduct slowly began to emerge.  Plaintiffs falsely represented to the District Court in Denver, for example, that Cabrera had spoken truthfully when he told the Lago Agrio court "that it would be 'unthinkable' that Plaintiffs would have provided him with technical information and support staff," because "*[t]his statement was made* **before** *the [Lago Agrio] court order [in January 2008] authorizing him to get material from the parties*," and that "[w]hen the Court *ordered* Mr. Cabrera to consider whatever submissions were provided by the parties, *the landscape changed considerably*."  Ex. MM at 2-3 (emphases added).  Plaintiffs repeated this misrepresentation last week to the Third Circuit, Ex. NN at 11-12, and again just last night in their brief before the Fifth Circuit—in a case set for argument on August 30, 2010.  Ex. OO at 5-6.

1.     In view of the seriousness of the wrongdoing shown in the limited outtakes reviewed to date, Chevron respectfully submits that this Court should issue an immediate evidence preservation order directed to the Respondents herein, and to the Lago Agrio Plaintiffs and their counsel, who have voluntarily subjected themselves to the jurisdiction of this Court, as well as all those acting in concert with them.  Although the duties of these parties to preserve all evidence—both physical and electronic—have already commenced by virtue of their notice of these and other related proceedings, Chevron urges this Court to make explicit what the law requires,

so there is no ambiguity and so that appropriate measures can be taken in the event that evidence

is determined to have "disappeared."

      2.      Furthermore, given this new evidence, Chevron requests leave to conduct limited

supplemental discovery of deposition testimony and documents from Respondents relating to

any communications between Respondents and any of the individuals listed in paragraph 1 of the

Second Circuit's Order dated July 15, 2010 ("July 15 Order"), Ex. K; any instances where in-

structions from or actions by those individuals led to cameras being turned off; and what was

said or done by those individuals when the cameras were turned off.  As Chevron has now dis-

covered, the outtakes show that Plaintiffs' counsel instructed the *Crude* crew, with some appar-

ent success, not to film certain individuals and not to record certain conversations that go to the

heart of Plaintiffs' scheme.  For instance, it is evident from the footage of the March 3, 2007

meeting that the camera crew was instructed to avoid filming Cabrera, and although Plaintiffs'

attorneys direct many of their speeches to Cabrera, his face is shown for only a few fleeting mo-

ments.  The requested discovery would not intrude on any journalistic privilege and is presump-

tively authorized by 28 U.S.C. § 1782.  This information from sources that this Court has already

held are non-confidential is highly relevant to discovering the extent of Plaintiffs' knowing fraud

in Ecuador, as well as the extent of their misrepresentations in this and other United States

courts.  Further, the discovery from Respondents herein is not reasonably available from Plain-

tiffs' attorneys or their associates, who are highly unlikely to cooperate and who on key subjects

may invoke their Fifth Amendment right against self-incrimination.

      3.      Finally, Chevron requests this Court's assistance in ensuring that Respondents

fully comply with the existing orders of this Court and the Second Circuit.  Respondents contend

their production is complete, but there are several discrepancies between what they have pro-

vided and their previous descriptions of the materials, including how many tapes exist and the time frame within which the tapes were shot.  Without explanation, Respondents now contend that certain tapes not produced have been "lost."  Due to inadequacies in Respondents' privilege log, Chevron cannot verify that all of the responsive outtakes have in fact been produced.  Accordingly, Chevron respectfully moves for an order compelling Respondents to provide the original footage log in its native format, to provide a complete privilege log describing the contents of all the segments they have withheld as ordered by this Court on July 21, 2010, and to produce any and all remaining footage that shows (a) any of Plaintiffs' attorneys and consultants or their associates (including representatives of the Amazon Defense Front and Amazon Watch, who have extensively collaborated with Plaintiffs' counsel and consultants in publicizing the fraudulent Global Expert Assessment and the *Crude* film), (b) any court or private experts, and/or (c) any current or former Ecuadorian governmental officials.[2]

## II.   FACTUAL BACKGROUND

### A.   The *Crude* Outtakes Show That Plaintiffs' Counsel and Consultants Planned and Created the Supposedly Independent $27.4 Billion "Global Expert Assessment"

The outtakes that Chevron has reviewed so far leave no doubt that Plaintiffs arranged for Cabrera's appointment and decided what Cabrera's report would say, and that Plaintiffs' lawyers and their U.S. consultants—not independent experts working for Cabrera—drafted Cabrera's initial work plan and ultimately his damages assessment in the Lago Agrio Litigation.

---

[2] Moreover, in view of Respondents' admitted and unexplained "loss" of certain videotapes and palpably close connection to Plaintiffs—including editing out damaging scenes at Plaintiffs' request—the Court should consider ordering Respondents to turn over possession of all video tapes to the Court pending issuance of the Second Circuit's final order.  Chevron also requests that it be permitted to question Respondents regarding the lost or destroyed tapes.

**1.    On March 3, 2007, Plaintiffs' Counsel and Consultants Met With "Special Master" Cabrera to Plan His "Global Assessment," Two Weeks Before Cabrera Was Appointed by the Court**

The outtakes depict key members of Plaintiffs' legal and technical teams meeting with Richard Cabrera to discuss, step by step, how the "*Peritaje Global*" will be executed.  The members of Plaintiffs' litigation team present at the meeting include:  (1) Steven Donziger, lead U.S. counsel for Plaintiffs, (2) Pablo Fajardo, lead Ecuadorian counsel for Plaintiffs, (3) Luis Yanza, representative of Amazon Defense Front or Selva Viva; (4) Dick Kamp, director of E-Tech; (5) Ann Maest, a managing scientist at Stratus and E-Tech; and (6) Charlie Champ, of Champ Science and Engineering. *See* Ex. F at 187-01-02-01, 187-01-02-02, 187-01-02-03, 189-00-01, 189-00-02, 189-00-03, 191-00-01, 191-00-02, 192-00-01; Hendricks Decl. at ¶¶ 12-27.



**Luis Yanza, Richard Cabrera, and Pablo Fajardo at March 3, 2007 meeting.**  Hendricks Decl. at ¶34.

This meeting takes place at Selva Viva headquarters on March 3, 2007, which falls between Cabrera's appointment as a Judicial Inspection Expert for the Ecuadorian court on November 15, 2006 and his appointment as the "*Global Perito*" on March 19, 2007—and nearly 11 months before the January 30, 2008 order, Ex. BB, that Plaintiffs have recently claimed in U.S. court proceedings supposedly authorized them to submit materials to Cabrera.  Cabrera is shown

on several occasions, though the camera appears to intentionally avoid filming him for the majority of the time.  Ex. F at 187-01-02-01, 189-00-01, 191-00-01.  The day following the meeting, one participant acknowledged his awareness of its impropriety, characterizing Cabrera's presence as "bizarre."  Ex. F at 196-00-01.

In the morning session, Plaintiffs' counsel Pablo Fajardo presents a PowerPoint outlining the "*Plan Para el Examen Pericial Global*," or Plan for the Global Expert Assessment.  Ex. F at 187-01-02-12.  Fajardo describes the logistics of testing and sampling.  Further, as part of this plan, Fajardo lays out the Plaintiffs' refusal to hold Petroecuador responsible for its actions, and discusses plants to attack Texaco's remediation in 1998.  *Id.*

Fajardo also talks about the content of the expert report, including what legal standards and parameters should govern.  Fajardo even specifies how the final report should look and the various sections it should have:

> It must have an executive summary, a conclusive executive summary, that is, maybe the report is sixty, a hundred pages, which will make it difficult for the judge and perhaps other people to read.  Maybe in five pages, or ten pages, a very clear executive summary, very didactic, understandable and conclusive. . . .

> We must categorize the wells operated by Texaco, the ones remediated by Texaco, the hidden pools, the toxic components, a list of what was found during the expert's study, and the inspections, the extent of the damage, the toxic products . . . . as far as the biotic aspect, damage to the flora and fauna, the most affected species, both land and ichthyological species, or fish.  On the human side, effects on the indigenous peoples, culture, effects on people's lives, both to their health and to their possessions.  It must also have repair mechanisms and establish the costs to repair the damage.

Ex. F at 187-01-02-12.



**Pablo Fajardo Presenting at March 3, 2007 meeting.**  Hendricks Decl. at ¶ 34.

Fajardo also outlines a plan for dealing with Chevron.  He says that "Chevron's main problem right now is that it doesn't know what the hell is going to happen in the global expert examination.  In other words, they don't know that.  I hope none of you tell them, please. [laughter]  They don't know what's going to happen.  It's a prob – [laughter] . . .  It's Chevron's problem."  *Id.* at 191-00-03.  Fajardo then identifies six strategies or steps that must be taken to counteract Chevron's actions, specifically: (1) the team must "[k]eep up the pressure and constant oversight in the court"; (2) the team must "[m]ake certain that the expert constantly coordinates with the plaintiffs' technical and legal team"; (3) "[t]he plaintiffs' technical coordinator must be [involved] in the process fulltime" and "[a]ccompany the expert in the field"; (4) "an attorney . . . will always be in the field to also protect the activity being performed"; (5) the team must "provide the facilities and necessary support to the field team"; and finally, (6) the team must "support the expert in writing the report."  *Id.*.

Fajardo emphasizes that everyone needs to contribute to the report, explaining:  "And here is where we do want the support of our entire technical team . . . of experts, scientists, attorneys, political scientists, so that all will contribute to that report—in other words—you see . . .

8

the work isn't going to be the expert's.  All of us bear the burden."  *Id.*  One of the translators

asks whether the final report is going to be prepared only by the expert.  Fajardo says that the

expert will "sign the report and review it.  But all of us . . . have to contribute to that report."  *Id.*

Maest asks, "Together," and Fajardo confirms.  Maest then states, "But not Chevron," to which

everyone laughs.  *Id.*  These admissions stand in stark contrast to the Ecuadorian court's repeated

orders that Cabrera be "responsible for the entire report, the methodology used, for the work

done by his assistants, etc." and "maintain strict independence with regard to the parties."  Ex. Y

at 132846-132855; *see also id.* ("The expert has agreed to be responsible for all information and

conclusions contained in the expert report.  The activity of the assistants is included in the oath

sworn by the expert Richard Cabrera, who was appointed as the sole expert.").

   Following Fajardo's presentation, Donziger takes the floor.  He makes the point that

"with regard to the remediation that Texaco did, it's important, I believe – to – to – to discuss

this in a special way.  Because right now there's a – an official claim by the Ecuadorian State . . .

that what Texaco did was a fraud," and "let's think a little about emphasizing that."  Ex. F at

188-01-01.  Then, in discussing the rules and regulations regarding limits for certain substances,

Donziger says, "Basically these are pits and Ecuador has industrial standards for which TPH are

much higher. . . .  But we make the argument that this whole area is a delicate ecosystem because

it is the rainforest, and because people are living next to and on top of the pits."  *Id.* at 188-00-02.

Then, Donziger adds in Spanish, "So as lawyers, we don't make a distinction between the TPH

standards for the pits and the rest of the ecosystem because . . . it's the Amazon jungle, every-

thing is delicate, and because people live everywhere."  *Id.*  Maest comments that "we need a

section in . . . in the final report that explains all that."  *Id.*  Donziger responds, "Exactly."  *Id.*;

*see also id.* at 188-00-01 (Donziger discusses how, given that they have limited financial re-

sources, Cabrera's report should be based as much on the results they already have as on new field work..); *id.* at 188-00-02 (Donziger and Maest discuss that the global assessment must clearly support Plaintiffs' position that damages should not distinguish between contamination inside and outside the pits.).



**Ann Maest, Steven Donziger, and Dick Kamp at March 3, 2007 meeting.**  Hendricks Decl. at ¶ 35.

At one point during the meeting, the footage shows Donziger go over towards Cabrera; although Donziger is heard loud and clear throughout the entire meeting, as soon as he walks over towards Cabrera, his voice cannot be heard.  Ex. F at 188-00-06.

In the afternoon session, the group discusses the "work plan" for the Global Peritaje, which is the first document that Cabrera would be required to sign and file with the court. Donziger explains:

> I – I believe that the most important task is for us to define a work plan.  Specific. With dates, teams, and budget. . . .  For me, it means defining the objectives.  For example, if we are or are not going to do ground water monitoring.  That's one example.  How many sites studied in depth.  We're going to follow your recom- mendation that we analyze around six and – and TPH or other things, too.  Uh, what laboratory?  And is it qualified?  What are the logistics for organizing every- thing to achieve the objectives in three months?  How many people do we need? And, apart from the technical details, let's decide what we're going to do with re- gard to the human and biotic impacts, etcetera. . . .  The – the work definition has

> to include the evidence, the remediation costs and the expert's opinion.  Do you
> all understand?  Doing everything, that's a – a – it's the most important job like I
> said – because without that clarity at the start, that is never going to work.

*Id.* at 189-00-02.  Donziger proposes that he and the U.S. consultants form a "work committee"
to present a "draft plan," with a goal of having "more or less eighty percent – ninety percent on
the way to a plan" in a few days.  *Id.*  Looking at Cabrera, Donziger then says, "and Richard, of
course you really have to be comfortable with all that.  And we'll also def – define the support
the expert needs."  *Id.*

The recording of the meeting ends with Donziger talking about the ways to make Chev-
ron pay more, and he comments, "We could jack this thing up to $30 billion in one day."  *Id.* at
193-00-01.

> **2.      On March 4, 2007, Plaintiffs' Counsel and Consultants Admitted That They
>          Had No Actual Evidence of Groundwater Contamination and Planned to
>          Submit Fraudulent Evidence**

The footage from March 4, 2007 captures a lunch meeting involving Donziger and the
U.S. environmental consultants, Maest, Kamp, and Champ, during which they discuss what hap-
pened at the meeting with Cabrera the day before.  *See* Ex. F at 198-00-01 (also discussing the
need for the facts of the case and that Kamp is "doing appendices" for Donziger).



**Dick Kamp, Ann Maest, Steven Donziger, and Charlie Champ at March 4, 2007 lunch meeting.**
Hendricks Decl. at ¶ 36.

At several points, the experts raise issues and problems with the plan, each of which Donziger brushes off.  First, Champ says, " I know we have to be totally transparent with Chevron in showing them what we're doing."  Donziger answers, "No, no," and says, "Because they will find out everything we do."  He goes on to explain that "[o]ur goal is that they don't know shit . . . and that's why they're so panicked."  Ex. F at 196-00.

Kamp then comments to Donziger, "Having the perito [Cabrera] there yesterday in retrospect . . . That was bizarre."  *Id.*  Donziger looks at Kamp for about two or three seconds.  He then instructs Kamp:  "Don't talk about it," and tells the camera crew, "And that is off the record."  *Id.*  Donziger tells the experts, "I've got total control over the film . . . ."  He then retracts his statement, saying, "I'm just joking, I really don't."  *Id.*

Donziger then explains, "That's the way it works," adding, "Believe me, I would much rather have it work the normal way . . . I would rather have it work the normal way, then I wouldn't have to worry about stuff like that."  *Id.*

During the same lunch, the experts tell Donziger there is no evidence contamination has spread into the groundwater.  Donziger tries to convince them otherwise, but when they are not easily swayed, he finally says, "You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want" and "[t]herefore, if we take our existing evidence on groundwater contamination, which admittedly is right below the source . . . [a]nd wanted to extrapolate based on nothing other than our, um, theory," then "[w]e can do it.  And we can get money for it."  *Id.* at 195-05.  He goes on, "[T]his is all for the Court just a bunch of smoke and mirrors and bullshit."  *Id.*.  When Champ argues that "there is not enough information on that ground water" and that "the one hole in the remediation, is the

12

water," Donziger ultimately breaks off the discussion, stating, "There's another point I got to make . . . with these guys, but I can't get this on camera," and the clip ends. *Id.*

**B.** **Plaintiffs' Counsel, Consultants, and Associates Have Made Repeated Misrepresentations About the Fraudulent "Global Expert Assessment" and Their Roles in Planning, Creating and Exploiting It**

Plaintiffs' counsel and their associates—including Cabrera himself—have represented on numerous occasions, in numerous venues, that they have never engaged in improper *ex parte* contacts with Cabrera, whom they have touted as an "independent" and "neutral" expert who acted as a "Special Master" to the Lago Agrio court. The *Crude* outtakes Chevron is in the process of reviewing directly impeach the repeated representations that Plaintiffs have made to push their false damages report through in Ecuador, to hide the evidence of their fraud from United States District and Circuit courts, to falsely influence the United States Congress and U.S. regulators to pressure or punish Chevron, and to mislead the worldwide press.

**1.** **Misrepresentations Before the Lago Agrio Court**

For years, Plaintiffs and Cabrera have worked in tandem to falsely assure the Lago Agrio court that Cabrera was properly fulfilling his function as an independent, neutral court expert and performing his work in a fully transparent manner. On October 17, 2007, Plaintiffs "categorically reject[ed] the participation of . . . any external overseer in the overall judicial expert investigation," asserting that there was no need for an overseer "within an ***independent*** judicial investigation" and that "Richard Cabrera has demonstrated his moral integrity and his technical aptitude for carrying out this important judicial procedure." Ex. AA at 133259-133261 (emphasis added). Plaintiffs even accused Chevron's lawyers of "forgetting that Cabrera was the impartial court expert" and hiring "a legion of their own technicians to 'give the lie to' his conclusions before hand." *Id.* Similarly, on July 23, 2007, Cabrera filed a letter in the Lago Agrio court stating, "I should clarify that I do not have any relation or agreements with the plaintiff, and it seems

13

to me to be an insult against me that I should be linked with the attorneys of the plaintiffs." Ex. X at 131972.  Again, on October 11, 2007, Cabrera filed a pleading stating, "***The defendant's attorneys allege that the plaintiff is in 'close contact' with me, and that the plaintiff has provided me with technical information and support staff to assist with the expert examination. This is untrue***.  If I need any technical information in connection with this case, all I have to do is request it from this Court*; the idea that the plaintiffs would be helping me with that is unthinkable*." Ex. Z at 133178-133180 (emphases added).

And on February 18, 2008, after the January 30, 2008 court order that purportedly authorized them to secretly provide materials to Cabrera, Plaintiffs filed a pleading stating:  "In light of Your Honor's order, the plaintiffs acknowledge that it is our obligation to cooperate with the legal system to clarify matters in this case, and in particular with the Expert, so that he may produce an efficient, ***transparent***, well founded and ***impartial*** report. . . . .  [I]n compliance with the Court's order, the plaintiffs hereby submit an array of documents that we believe the Expert should take into account in his report. . . . .  We clarify that ***all the information we are delivering to the Expert through the Court has been provided to us by various Ecuadorian public institutions over the last four years.***" Ex. CC (emphases added).

In his report filed with the Ecuadorian court on April 1, 2008, Cabrera represented that his work was done exclusively by impartial professionals who were part of his disclosed team, "[a]s stipulated in the Court order." Ex. DD at 2.  When Chevron raised questions as to the independence of Cabrera's report, Plaintiffs asserted in a filing to the court that the notion that there was a "common interest relationship between the expert Mr. Cabrera and the plaintiff" and that Cabrera "works for us" was "simply ridiculous." Ex. EE at 140166-140167.  In a filing on April 25, 2008, Plaintiffs characterized Chevron's claim of a close relationship between Plaintiffs and

Cabrera as "[a]nother infamy," "childish and absurd."  Ex. GG at 140265-140266; *see also* Ex.

HH at 140466 ("Subsequently, Dr. Carvajal [a Chevron team member] assures that the plaintiff

learned 'unilaterally' of the completion of Cabrera's work.  This would certainly mean that, ***according to Dr. Carvajal, that there is some type of collusion between the plaintiff and Cabrera.
I strongly oppose this ridiculous affirmation*** . . . .")) (emphasis added).  Cabrera also continued

to represent to the court that he had worked independently and transparently, saying in March

2009:  "All my work has been public.  I have concealed absolutely nothing, my report has been

submitted to the Court of justice to which both parties have had access, I believe, without the

least impediment."  Ex. II at 154581.

### 2.    Misrepresentations Before United States Courts

The record of misrepresentations and deception that Plaintiffs have created before numerous U.S. federal courts is lengthy.  To pick only a few examples, in their very first U.S. filing, Plaintiffs attempted to stop the international arbitration that Chevron initiated pursuant to the

United States-Ecuador Bilateral Investment Treaty ("BIT Arbitration") by filing a petition (ultimately dismissed by Judge Sand) in which they falsely asserted that "[t]he best and most recent

***independent*** estimate available of the human health impact of this contamination is provided by

the ***neutral Special Master*** [Cabrera] appointed by the [Lago Agrio] court to provide advice on

damages."  Ex. KK at 14 (emphases added).  Plaintiffs continued by stating that "Dr. Cabrera

appointed a team of 14 technical officials," and that "the final report [was] ***produced by the
Cabrera team . . . .*** "  *Id.* at 14-15 (emphasis added).

Plaintiffs further represented that "[e]nvironmental remediation experts from the United

States have reviewed the Cabrera report and found its conclusions reasonable and its damages

assessment consistent with the costs of other large environmental clean-ups around the world."

*Id.* at 15-16,  What Plaintiffs did *not* tell Judge Sand, however, is that these were the same

"[e]nvironmental remediation experts from the United States" who, as captured in the *Crude* out-takes, secretly planned and wrote the Cabrera report they later publicly misrepresented as Cabrera's work rather than their own.  In fact, the statement from Plaintiffs' brief is a direct reference to a fifteen-page report written by Plaintiffs' primary U.S. consultant firm, Stratus, that was published in December 2008.  Ex. JJ.  In that publication, signed by Maest and others, Stratus purported to review Cabrera's report, and based on that "review," declared that Cabrera's approach was "reasonable" and that his conclusions were "consistent with actual cleanup costs and damages at other large environmental contamination cases around the world."  *Id.* at 1, 8.

Indeed, it was only after Chevron confronted Plaintiffs with irrefutable evidence that Cabrera's report secretly incorporated verbatim large quantities of the work of Stratus consultants, and the District Court in Denver pointedly questioned them about it, that Plaintiffs finally conceded that they had delivered some materials to Cabrera that were never disclosed on the record.  But having been forced by concrete evidence into a partial admission, Plaintiffs continued to cover up their malfeasance by falsely claiming that they had provided these materials to Cabrera only because of—*i.e.*, after—the Ecuadorian court's order on January 30, 2008 supposedly directing them to provide certain documents to Cabrera.[3]  *See, e.g.*, Ex. MM at 2 (arguing that Cabrera's statement that it would be "unthinkable" for Plaintiffs to be helping him was irrelevant because it "was made *before* the court order authorizing him to get material from the parties," and "[w]hen the Court *ordered* Mr. Cabrera to consider whatever submissions were

---

[3] This claim is a red herring:  On January 30, 2008, based on a request from Cabrera, the Ecuadorian court allowed the parties to provide to Cabrera via the court three specific, limited categories of historical documents.  *See* Ex. Z (Lago Agrio Court Order dated Jan. 30, 2008).  Moreover, the court never authorized, much less ordered, Plaintiffs to secretly deliver documents to Cabrera without disclosing them to Chevron.

16

provided by the parties, the landscape changed considerably")) (emphases in original); *see also* Ex. LL at 2; *see also*, Ex. F at 269-00-01 (Donziger discussing hiring Stratus to prepare damage claims).

Similarly, in their appeal from this Court's Order granting Chevron's discovery, Plaintiffs represented to the Second Circuit that "Chevron complains that plaintiffs contributed materials to court expert Richard Cabrera but the Lago Agrio court *invited* the parties to contribute materials to Cabrera."  As support, Plaintiffs cited an even later court order, one issued on April 14, 2008. Ex. Q at 3 (citing "*In re Chevron Corporation*, 10-cv-00047 (D.Ct. Co.) Dkt. #119-15 (April 14, 2008 Order of the Lago Agrio Court) at 2 of 16 ('[T]he parties may submit to the expert [Cabrera] whatever documentation they believe may be useful in preparing his report.')")).

Plaintiffs also told the Second Circuit that Chevron's "allegations" were "flimsy" and a "highly speculative . . . diversionary fishing expedition."  Ex. P at 30.  In fact, Plaintiffs asserted that "[n]one of the 600 hours of footage (much less all 600 hours of footage) is itself evidence of a crime or claim, or impeachment evidence of the 'key witness' or of the defendant, or the sole evidence of guilt, or anything close to it."  Ex. Q at 25.

Specifically, with respect to Dr. Carlos Beristain, a supposedly neutral member of Cabrera's team, Plaintiffs told this Court that the scene in the Netflix version of *Crude* showing him conducting a focus group, accompanied by members of Plaintiffs' litigation team, was "innocuous" and "of no relevance to anything," even though Cabrera relied on Dr. Beristain's study to generate a damage assessment for "excess cancer" deaths.  Ex. O at 8.  Plaintiffs further claimed to the Second Circuit that the only reason they requested Berlinger to delete the scene from the DVD version of the film was to "avoid the misimpression, cynically fostered by Chevron below, that plaintiffs participated in one of Dr. Beristain's focus groups *after* he was court

17

expert." Ex. P at 23 (emphasis in original).  These representations, too, have been proven to be

patently false.  This past week in a related § 1782 proceeding and pursuant to subpoena, Stratus

produced emails showing that a Stratus employee was communicating with Dr. Beristain about

his work in July and August 2008—*after* he was a court expert.  Ex. PP.  These communications

occurred between Cabrera's April 2008 report and his November 2008 supplemental report in

which Cabrera increased the assessed damages relating to Dr. Beristain's work from $2.9 billion

to $9.5 billion.  Stratus also served a privilege log listing, and improperly and baselessly with-

holding, email communications involving Stratus, Dr. Beristain, and Plaintiffs' attorneys from

the same time period.  The log describes these as emails "regarding technical expert's provision

of survey to consulting expert for analysis and providing comments on same," and "regarding

technical expert's work on global damages assessment in preparation for analyzing and provid-

ing comments on same."  Ex. QQ.

> ### 3.   Misrepresentations Before the United States Congress and Federal Regulators

Plaintiffs' counsel have made similar false statements about Cabrera's supposed inde-

pendence to Congress.  In April 2009, Donziger testified before the congressional Tom Lantos

Human Rights Commission, and stated that "[t]he best and most recent independent estimate

available of the human health impact" was the report issued by Cabrera, who, "along with a team

of 14 technical officials, reviewed all the data in evidence . . . ."  Ex. SS.  Donziger also testified

that "[n]umerous qualified scientists have reviewed this report and found its conclusions reason-

able and the damages assessment consistent with the costs of other large environmental clean-

ups," *id.*, without disclosing the fact that the "qualified scientists" were Plaintiffs' experts from

Stratus, who planned and wrote the Cabrera report.

Plaintiffs have unabashedly made similar allegations in complaints to federal securities regulators.  For example, on March 18, 2008, Amazon Watch, an organization closely affiliated with Plaintiffs' counsel, told the Securities and Exchange Commission that the Ecuadorian court had appointed Cabrera as "an independent special master" and that he had prepared his report "mak[ing] use of all evidence collected" with "a large team of technical experts under [his] supervision."  Ex. RR at 2.

Plaintiffs have made these same claims to other federal agencies as well.  In a letter to the Office of the United States Trade Representative, Plaintiffs' representatives Luis Yanza and Fajardo called Cabrera "an independent court-appointed special master," and stated that "the bulk of the evidence relied on by the special master, Professor Richard Cabrera, was provided by Chevron itself via its own sampling evidence."  Ex. TT at 2.

### 4.      Misrepresentations in the Press

Plaintiffs' misrepresentations in the worldwide press have been even more prodigious and flagrant.  Plaintiffs and their collaborators, including the Amazon Defense Front and Amazon Watch, have waged a massive public relations campaign to smear Chevron in order to extort money.  The centerpiece of that campaign, like Plaintiffs' strategy, has been false statements about Cabrera's supposed "independence" and "neutrality."

For example, in the days following Cabrera's filing of his first report with the court, Fajardo was quoted in a press release issued by Amazon Defense Coalition, Plaintiffs' partner (and an organization virtually indistinguishable from the Frente), as saying that "Chevron's claim that Professor Cabrera is cooperating with the plaintiffs is completely false," and that "Chevron is frightened by Cabrera precisely because he is an independent and credible expert."  Ex. VV.  Fajardo declared that the expert report was "extremely significant because it is a direct rebuke to Chevron's credibility and it validates the damages claims in the lawsuit."  Ex. UU.  Donziger

made similar comments, saying that the report validated Plaintiffs' arguments and was a "complete rejection of everything that Chevron has been saying since the case began 15 years ago." Ex. WW.[4]

When Cabrera "updated" his report in November 2008 to increase the total damages assessed to $27.4 billion, the Amazon Defense Coalition extolled Cabrera's report as an "independent" assessment by the "Special Master" based on the review of the "trial evidence—the vast majority of it provided by Chevron."  Ex. XX.  The press release announced that a team of scientists, specifically Douglas Beltman and Ann Maest of Stratus, an environmental consulting firm that had "prepared damages assessments . . . under the auspices of the U.S. Department of Justice," had reviewed and found Cabrera's latest report "reasonable"—a reference to the Stratus "Comments," which, as discussed above, Plaintiffs have repeatedly pointed to as an independent peer review purportedly validating Cabrera report.  *Id.*; *see also* Ex. YY ("Professor Cabrera was assisted in the work by 14 scientists covering all relevant disciplines.  In addition, ten U.S.-based scientists who reviewed the report and found it consistent with sound scientific practice.").

Plaintiffs have unsubtly attempted to use such misrepresentations in the press to manipulate Chevron shareholders.  In an April 2008 press release issued by the Amazon Defense Coalition, Fajardo claimed that Chevron had refused to divulge that Ecuador's Attorney General had filed a formal complaint to the U.S. Department of Justice, and that "[t]his is part of [a] conscious strategy to try to discredit a trial process that Chevron knows it is losing because of the evidence."  Ex. VV.  In February 2009, "Fajardo added that comments made by [Chevron Gen-

---

[4]  This press release and the many similar ones issued by Amazon Defense Coalition regarding Cabrera's report are available on the AmazonWatch.org website, and can be located by running a one-word query:  "Cabrera."

eral Counsel Charles] James today in a Chevron press release, alleging without proof that an independent court expert was cooperating with the plaintiffs, were 'false and defamatory' and could expose Chevron shareholders to additional liability." Ex. ZZ.  In May 2009, Amazon Watch even sent a letter to Chevron shareholders, in which it claimed that "a team of independent experts appointed by the court to assess damages" had found that the alleged contamination caused more than 1,400 cancer deaths.  Ex. AAA.

And despite mounting evidence that Plaintiffs' own experts ghostwrote Cabrera's report, Plaintiffs have continued to propagate the same lies.  In May 2010, Fajardo again denied any wrongdoing, claiming that Cabrera had worked independently and that it was possible that he had included information that had been asked for through the court system.  When asked about the involvement of Stratus, Fajardo told the media, "They are our technical advisers in the United States, and they have worked with us for some years, but they have never interfered in the trial."  Ex. BBB.

## III.    THE COURT SHOULD ENTER AN EVIDENCE PRESERVATION ORDER

The video outtakes produced pursuant to the orders of this Court and the Second Circuit reveal that in planning and executing their fraudulent "Global Expert" scheme, Steven Donziger and his associates have acted with contempt for the truth, and contempt for the laws and legal institutions of Ecuador and the United States.  In the interests of protecting the integrity of proceedings before this Court and the other institutions that have been touched by this grave misconduct, Chevron petitions the Court to enter an order mandating preservation of all evidence related to the fraudulent "Global Expert" scheme as documented in the *Crude* documentary and the outtakes produced to date.

Even absent a court order, parties have an independent duty to preserve evidence that may be relevant to pending or even future litigation. *See Kronisch v. United States*, 150 F.3d 112, 126-27 (2d Cir. 1998) (the "obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation—most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation"); *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y. 1991) (Francis, M.J.) (a litigant must preserve "documents and information in its possession [that] are relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence"). The court has, however, the inherent power to enter an express order to ensure that evidence is preserved and not destroyed. *See, e.g.*, *In re. Applic. of Nat'l Broad. Co.*, No. M-77, 1997 WL 33442116, at *3 (S.D.N.Y. Aug. 1, 1997) (Batts, J.) (granting § 1782 application and ordering all entities served with subpoenas "to preserve all documents described therein pending full compliance with the subpoena and any additional proceedings relating to the matter"); *see also In re Trump Hotel Shareholder Derivative Litig.*, No. 96CIV.7820, 1997 WL 442135, at *2 (S.D.N.Y. Aug. 5, 1997) (Pitman, M.J.) (ordering defendants "to preserve all documents in their possession or under their control which they have either already been requested by plaintiffs or which are likely to be the subject of a discovery request from plaintiffs" so as to "minimize the chance of prejudice"); *HJB, Inc. v. Am. Home Prods. Corp.*, No. 93 C 6728, 1994 WL 31005, at *1 (N.D. Ill. Feb. 1, 1994) (entering document preservation order and observing that orders are common in complex litigation); *cf.* Manual for Complex Litigation (4th ed. 2004) § 11.442 (noting that "[b]efore discovery starts, and perhaps before

22

the initial conference, the court should consider whether to enter an order requiring the parties to preserve and retain documents, files, data, and records that may be relevant to the litigation").

In light of the clear evidence of fraud, and the significance of other such evidence that has yet to be uncovered, the Court should enter an immediate preservation order directed to Plaintiffs and their counsel, as well as to Respondents, making it absolutely clear that any evidence potentially relevant to the issues in the Lago Agrio Litigation, the BIT Arbitration, or the criminal cases against Rodrigo Pérez Pallares and Ricardo Reis Veiga must be preserved. [5]

## IV.   THE COURT SHOULD AUTHORIZE SUPPLEMENTAL DISCOVERY

The outtakes that Respondents have produced thus far have brought into the sunlight what Plaintiffs' counsel and their associates have tried so hard to keep hidden—their fraudulent collusion with court expert Cabrera to present their allegations and damages figures as his "independent," "neutral" assessment.  However, the outtakes have also revealed that after soliciting Berlinger to tell their story, and granting his crew extraordinary access to everything else about the litigation, Plaintiffs' counsel specifically instructed the crew not to record certain conversations discussing the fraud, in an obvious attempt to avoid leaving too much tangible evidence behind.  In addition, it appears that Plaintiffs directed the crew not to film Cabrera, at least not during *ex parte* meetings with Plaintiffs' team.  It is also evident that Respondents complied with these instructions and directions, at least in certain instances and to a certain extent.

In view of this new evidence, Chevron requests leave to conduct some limited additional discovery.  Specifically, Chevron seeks to expand the scope of the depositions that this Court has already authorized to cover communications Respondents had with any of the individuals listed

_____

[5]  Respondents' counsel has advised that her clients will consent to a preservation order.

in paragraph 1 of the Second Circuit's July 15 Order,[6] instances such as the ones described above where instructions from or actions by one or more of the listed individuals led to cameras being switched off, and what was said or done by those individuals when the cameras stopped rolling.  Chevron also seeks the production of any written communications or documents relating to these specific topics.[7]  These discovery requests, which by definition seek information provided to Respondents by non-confidential sources, are narrowly tailored to ascertaining the details of Plaintiffs' fraudulent scheme to manufacture a $27.4 billion damages assessment and their efforts to cover it up—evidence that would be highly material to the issues in the Lago Agrio Litigation, the BIT Arbitration, and the criminal cases against Chevron's attorneys.  Furthermore, this information is not reasonably available from Plaintiffs' attorneys and the other participants in the fraudulent scheme.

A.    **The Supplemental Discovery Is Permissible Under *Gonzales* and the Second Circuit's July 15, 2010 Order**

The discovery that Chevron seeks by this motion is information that Respondents received from Plaintiffs' counsel and other sources this Court has already held are non-confidential, or obtained by virtue of the unfettered access they were granted in exchange for making the film.  This information is non-confidential, highly relevant, and not reasonably available from other sources.  Therefore, Chevron is entitled to the requested discovery under *Gonzales v. National Broadcasting Co.*, 194 F.3d 29 (2d Cir. 1999).

---

[6] These individuals are Plaintiffs' counsel (necessarily including their agents), private or court-appointed experts connected with the Lago Agrio Litigation, and current or former officials of the Government of Ecuador.

[7] The supplemental subpoenas that Chevron requests the Court to issue are attached as Exhibits A through E to the Hendricks Declaration.

As this Court observed in its May 20, 2010 order, we are not dealing here with "the iden-
tities of sources who provided information on an assurance of confidentiality." *In re Applic. of
Chevron Corp.*, No. M-19-111, 2010 U.S. Dist. LEXIS 51578, at *27 (S.D.N.Y. May 20, 2010).
The sources at issue here are the opposite of confidential:  First, there are Plaintiffs' lawyers, the
unabashed stars of the film who "are on the screen throughout most of *Crude*."  *In re Applic. of
Chevron Corp.*, __ F. Supp. 2d __, 2010 WL 1801526, at *11 (S.D.N.Y. May 6, 2010, as cor-
rected May 10, 2010).  Then, there are the representatives of Plaintiffs' partner organizations,
including the Amazon Defense Front and Amazon Watch.  The identities of those individuals
and organizations are no secret, as they are the media machine behind Plaintiffs' case.  But these
organizations did not merely coordinate Plaintiffs' smear campaign against Chevron, they have
worked in step with Plaintiffs' counsel to endorse Cabrera's falsified damages report as inde-
pendent and valid, to the public, to U.S. federal agencies, and even to Chevron shareholders.
Next, there are Plaintiffs' experts, who have issued publications purporting to be "independent"
reviews of Cabrera's "independent" assessment and who have hailed the "reasonableness" of
Cabrera's report in the press releases issued by Amazon Watch.  And finally, there are Cabrera,
President Correa, and other officials—public figures who appear in numerous scenes in the film.

Furthermore, there is no evidence that these individuals granted Respondents access to
their private meetings and discussions—whether recorded or unrecorded—on an assurance of
confidentiality.  To the contrary, as this Court has found, Donziger "solicited" Joseph Berlinger
to create a documentary of the litigation, and in exchange, Donziger granted Berlinger and his
crew "'extraordinary access to players on all sides of the legal sides of the legal fight and be-
yond,'" including access to players and discussions that were not caught on film. *Id.*  There is
also no evidence that Respondents are prohibited by any confidentiality agreements with any of

the individuals listed in the July 15 Order not to disclose any information learned while "on set" or the instructions given about what not to film.  Indeed, the outtakes that have already been produced show Donziger giving such instructions.

Where, as here, the protection of confidential sources is not involved, a civil litigant "is entitled to the requested discovery notwithstanding a valid assertion of the journalists' privilege if he can show that the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources."  *Gonzales*, 194 F.3d at 36; *see In re Applic. of Chevron Corp.*, 2010 WL 1801526, at *9 (citing *Gonzales* for the same proposition).  This test for overcoming the qualified privilege applies to any non-confidential materials, including communications with and documents received from non-confidential sources, notes taken by the journalist, as well as the journalist's own perceptions.  *See Carter v. City of New York*, No. 02 Civ. 8755, 2004 WL 193142, at *1 (S.D.N.Y. Feb. 2, 2004) (Holwell, J.) (holding that *Gonzales* "establish[es] a qualified privilege as to *all information gathered by a reporter whether through electronic recordation, such as a videotape, or through direct perception*") (emphasis added)); *In re Ramaekers*, 33 F. Supp. 2d 312, 313-14, 317 (S.D.N.Y. 1999) (Pauley, J.) (compelling reporters to produce all tape recordings, interview notes, and conversations with non-confidential sources, which were relevant to securities fraud case); *see also Lonegan v. Hasty*, No. CV-04-2743, 2008 WL 41445, at *4 (E.D.N.Y. Jan. 1, 2008) (Pohorelsky, M.J.) (holding that defendant had made enough of a showing to require the journalist "to divulge some information otherwise protected by the qualified privilege," including documents concerning communications with plaintiff, and deposition testimony from the journalist on conversations or other communications with plaintiff); *Boland v. Town of Newington*, No. 3:05-CV-1739, 2007 WL 128915, at *1 (D. Conn. Jan. 12, 2007) (Hall, J.) (applying *Gonzales* and holding that plain-

tiff had overcome the qualified privilege and could depose the journalist).

The supplemental discovery that Chevron seeks easily meets the requirements of *Gonzales.* First, the requested discovery is likely to reveal highly relevant evidence that can further flesh out the collusion between Plaintiffs' counsel and Cabrera, and their scheme to fraudulently obtain a $27.4 billion damages judgment against Chevron. As this Court has held, "Any interaction between plaintiffs' counsel and a supposedly neutral expert in the Lago Agrio Litigation would be relevant to whether the expert is independent and his damages assessment reliable"—a fundamental issue on which the Lago Agrio Litigation may ultimately turn, and one that is very important to the defense of Pallares and Veiga as well. *In re Applic. of Chevron*, 2010 WL 1801526, at *10. The requested discovery is also likely to reveal evidence that Plaintiffs' counsel and their associates engaged in other improper, unrecorded interactions with the Ecuadorian judiciary and government officials, which as this Court has held, would be relevant to the denial of due process and Chevron's other claims in the BIT Arbitration. *Id.*[8]

Second, the discovery that Chevron is seeking from Respondents is not reasonably obtainable from available sources. The only other individuals who would have the information are those listed on paragraph 1 of the Second Circuit's July 15 Order. However, one cannot expect participants in such a massive fraud to testify truthfully about the circumstances of the fraud. And in light of the incriminating evidence that the outtakes have revealed, the individuals who

---

[8] During the meet and confer, counsel for Mr. Berlinger declined to address the issue of instructions not to film outside the context of specific examples, and counsel for Chevron declined to discuss specific examples. Counsel for Berlinger did confirm, however, that Mr. Berlinger would take the position that at least some occasions when the camera was turned off would be considered confidential. The issue thus is joined, and these are likely to be the most relevant instances, because the extant outtakes show that Donziger and others requested the cameras be turned off precisely when they wished to conceal their wrongdoing.

can be found in the United States may not be willing to testify and therefore are not "available" sources under *Gonzales*. *See In re Applic. to Quash Subpoenas to Daily News, L.P.*, No. M8-85, 2010 WL 2102503, at *2 (S.D.N.Y. May 20, 2010) (McKenna, J.) (holding that defendant's assertion of his Fifth Amendment privilege satisfies *Gonzales*' requirement, for non-confidential materials, that the material not be reasonably obtainable from other available sources).

## B.     The Supplemental Discovery Is Not Unduly Intrusive or Burdensome

Chevron's requests are narrowly tailored to discover highly probative evidence of Plaintiffs' fraudulent scheme, and would entail only a minimal burden on Respondents.[9]  Chevron is not seeking the depositions of anyone other than Respondents, who have already been ordered to submit to a deposition on the issue of authentication.  Chevron merely requests that it be permitted to ask Respondents about these additional narrow topics.[10]  As for the document requests, they would simply require Respondents to conduct a reasonable search of their files and email inboxes.  And because any communications with the individuals listed in the July 15 Order, or any other responsive documents, would be non-confidential, there would be no need for Respon-

---

[9]   All of the other statutory requirements and discretionary factors that this Court held were met with respect to the request for the outtakes are satisfied here for the same reasons.  *See In re Applic. of Chevron Corp.*, 2010 WL 1801526, at *5-7.

[10]  Two of the Respondents are corporate entities.  Pursuant to Federal Rule of Civil Procedure 30(b)(6), Chevron is requesting that these Respondents produce a person or persons who can testify about information known or reasonably available to the organization relating to the specified topics.  *See In re Applic. of Winning (HK) Shipping Co.*, No. 09-22659-MC, 2010 WL 1796579, at *1, *10-11 (S.D. Fla. Apr. 30, 2010) (granting § 1782 application seeking to depose either the "superintendent of the ship managers, and/or the person most knowledgeable about the management of the vessel," and denying motion to quash because the requests were not "unduly intrusive or burdensome" and would not cause respondent undue hardship); *Cryolife, Inc. v. Tenaxis Med., Inc.*, No. C08-05124 HRL, 2009 WL 1229353, at *1-2 (N.D. Cal. May 5, 2009) (after granting § 1782 petition, document production, and a Rule 30(b)(6) deposition of a chief operating officer, allowing for an additional Rule 30(b)(6) deponent due to the inadequacy of the first deposition, and ordering testimony about additional information the court ordered produced).

dents to review or redact the materials. *See In re Applic. of Chevron Corp.*, 2010 WL 1801526, at *7 (concluding that "[r]equiring Berlinger to make the raw footage available to petitioners would impose minimal administrative costs on him").

Congress's twin aims in enacting § 1782 were to provide "equitable and efficacious discovery procedures" for participants in foreign litigation, and to encourage foreign countries to provide similar assistance to U.S. courts. *In re Bayer AG*, 146 F.3d 188, 195 (3d Cir. 1998); *see also Schmitz v. Bernstein, Liebhard & Lifshitz, LLP*, 376 F.3d 79, 84 (2d Cir. 2004). Both of these aims support the discovery that Chevron seeks by this motion, which is likely to produce highly probative evidence that can expose—and hopefully stop—Plaintiffs' attempt to corrupt the Ecuadorian legal system, and defraud Chevron in the process.

## V.   COURT SHOULD COMPEL COMPLIANCE WITH THE EXISTING ORDERS

Chevron also requests that this Court require Respondents to comply fully with the governing orders. The July 15 Order from the Court of Appeals required Berlinger to "promptly turn over to the petitioners copies of all footage that does not appear in publicly released versions of *Crude* showing: (a) counsel for the plaintiffs in the case of *Maria Aguinda y Otros v. Chevron Corp.*; (b) private or court-appointed experts in that proceeding; or (c) current or former officials of the Government of Ecuador." Ex. M. On July 16, July 20, and July 21, this Court entered orders regarding implementation of the Court of Appeals' July 15 Order.

To date, Chevron has received 421 master tapes in full and 16 digital tapes that have been partially redacted. Berlinger has represented that there are 520 tapes in total, not including six that he claims do not exist or have been lost. Therefore, Berlinger has produced over 80 percent of the footage that he says exists. Although Berlinger has substantially complied with the production order, there remain some issues that must be resolved in order to ensure that all of the

highly probative footage that this Court and the Court of Appeals have ordered produced are in fact produced.  First, Berlinger has not explained how the number of supposedly nonresponsive tapes more than doubled from 36 to 83.  In advance of the hearing on July 19, 2010, Berlinger's counsel informed the Court that Berlinger believed that 36 tapes would be entirely nonresponsive and would not be produced in whole or in part.  *See* Ex. T at 1; *see also* Ex. N at 1-2.  However, in the privilege log produced on July 30, 2010, Berlinger identifies 83 tapes that are supposedly nonresponsive.  *See* Ex. V.  Berlinger should be required to explain the basis for his change from 36 to 83 supposedly nonresponsive tapes.  Specifically, Berlinger should be required to identify whether he or his assistants reviewed every minute of those tapes to ensure compliance with the orders of this Court and the Court of Appeals, by making sure that no responsive material is included within those tapes (such as if, for example, Plaintiffs' counsel appeared for any period in any of those tapes).[11]

Second, Berlinger appears to have excluded from production some footage that includes key personnel acting on behalf of or in concert with Plaintiffs' counsel, including Atossa Soltani and Emergildo Criollo.  *See* Ex. V.  The July 15, 2010 Order requires Berlinger to produce "all footage that does not appear in publicly released versions of *Crude* showing: (a) counsel for the plaintiffs in the case of *Maria Aguinda y Otros v. Chevron Corp.*"  Ex. M (July 15, 2010 Order). It would strain the Second Circuit's Order to include only footage of counsel and not footage of those working on behalf of or in concert with Plaintiffs' counsel.  There is little question that groups such as Soltani's Amazon Watch and Amazon Defense Front have been working on behalf of or in concert with Plaintiffs' counsel in connection with the Lago Agrio Litigation, and

---

[11]  Berlinger's counsel has stated that no redactions occurred in the middle of any tape, only at the beginning or the end.  But the logs provide insufficient specificity on these redactions.

thus footage of personnel from those groups should be produced pursuant to the Second Circuit's Order.  Indeed, recognizing the role that personnel from such organizations have played on behalf of Plaintiffs' counsel, Berlinger has treated Luis Yanza and other members of Amazon Defense Front as part of Plaintiffs' litigation team, and has already produced footage including Luis Yanza.  *See* Ex. U.  Nonetheless, during the meet and confer, Berlinger's counsel stated that Mr. Berlinger has taken the position that communications with or film involving Amazon Watch and the Frente are privileged, even though they stand effectively in the same position as Yanza.  But Plaintiffs have asserted in the District Court in Colorado that the Frente, Amazon Watch, and Karen Hinton are so closely aligned that they fall within the circle of attorney-client privilege.  Ex. QQ.  They cannot possible contend here that communications with "Plaintiffs' counsel" do not include Karen Hinton, the Frente, and Amazon Watch.

Third, Berlinger's privilege log is inadequate.  This Court's July 21, 2010 Order specifically required Berlinger to produce a privilege log "enumerating each segment as to which privilege is claimed ('Segment')" and "[w]ith respect to each Segment," to identify "[i]ts general subject matter" and information concerning any person whose images appear or whose voice can be heard in each segment.  July 21, 2010 Order at 1.  Instead, the privilege log produced by Berlinger does not identify each ***segment***, but instead provides only very general descriptions of the subject matter of each ***tape***.  *See* Ex. V.  The second row of Berlinger's privilege log, referring to CRS041, highlights the inadequacy of the privilege log.  *Id*. at 1.  According to the last page of the privilege log, the asterisk after CRS041 identifies that tape as one that was produced in part after editing by Berlinger.  *Id*. at 1, 6.  Berlinger failed to include a separate entry for each ***segment*** of CRS041 that was not produced, instead describing the entire ***tape*** as a whole.  *Id*. at 1.  Moreover, the identified subject matter for the entire tape is "market b-roll."  *Id*.  This meager

information is insufficient to allow any person reading the privilege log to determine whether the material on CRS041 that was not produced was, in fact, outside the scope of the Second Circuit's July 15 Order.  Similarly, Berlinger withheld a number of tapes in their entirety for which the subject matter was listed in the privilege log only as "Clean Drinking Water Project Implementation."  *Id*. at 4 (CRS 463-66, 468-71).  Again, this information is insufficient to allow any person reading the privilege log to determine whether the material on these tapes was, in fact, outside the scope of the Second Circuit's July 15 Order.

Fourth, Berlinger has not provided any tapes from November 2005 and December 2005. Berlinger asserted to this Court that "Berlinger began principal photography for *Crude* in November 2005, and it continued through August 2008."  Ex. R at 4, citing Ex. S (Berlinger Decl. (Apr. 23, 2010), ¶ 15).  But the "logs" of tapes that Berlinger produced start with tape # CRS001 on January 20, 2006.  Ex. W.  Berlinger is required to produce all responsive footage that was ever shot in connection with *Crude*, including any footage he shot during November and December 2005.  Berlinger's counsel stated during the meet and confer that the November 2005 start date was a "mistake," and that Berlinger first visited Ecuador in January 2006.  But this does not necessarily mean that no filming took place in the United States before then, and this at most raises a factual issue requiring discovery.

Fifth, there is an issue of fact regarding whether Berlinger has produced his original tape log.  The "logs" of tapes that Berlinger produced appear to have been prepared in connection with this proceeding, rather than to be the original tape log that Berlinger kept.  *See* Ex. W.  For example, the "original footage log" produced on July 20 included a column titled "loaded?," which appears to reference loading tapes for review for production rather than some task that was reflected on the original footage log.  *Id*.  In addition, the "original footage log" includes a

32

column called "notes," but that column is almost entirely blank.  *Id*.  By contrast, in the "anno-

tated footage log," the notes column includes dates such as "7/20," likely referring to production

of those tapes in this proceeding.  *Id*.  Thus, one can reasonably infer that the "notes" column, at

least, was added to both the "original" and "annotated" tape logs to reflect notes concerning the

production of the tapes.  *Id*.  The "original footage log" produced on July 20, 2010, then, was not

actually the original footage log.  During the meet and confer, counsel for Berlinger stated that

they had produced the original log, as well as a litigation-derived variant.  The original log

should reflect the November 2005 start of filming, but does not.  Given the uncertainty, Chevron

requests that Berlinger produce his actual, original footage log, and, if the original footage log

was kept electronically, Chevron requests that Berlinger produce all versions of the original foot-

age log in native electronic format.

Sixth, based on its initial review, Chevron notes that the audio quality of some tapes is

not as strong as other tapes.  Chevron requests that Berlinger be required to identify if he has any

additional audio recordings of any footage produced and, if so, to produce them immediately.

Finally, Berlinger has identified two tapes (CRS415 and CRS472) as missing.  Chevron

has requested further information concerning the circumstances of the disappearance of those

tapes.  Berlinger's counsel has agreed to provide a declaration from Berlinger during the week of

August 2-6, but Chevron has not yet received that declaration, and thus reiterates its request here.

This unexplained "loss" of videotapes, coupled with Respondents' demonstrated affinity for

Plaintiffs—which extends so far as to edit out the Beristain footage at Plaintiffs' request, to turn

off or divert the cameras when Plaintiffs wanted, and even to engage in joint fundraising with

Plaintiffs—suggests that the Court should consider requiring—and would be well within its

rights to order—that Respondents deposit all the videotapes with the Court for safekeeping, until such time as the Second Circuit completes its opinion in this matter.

## VI.   CONCLUSION

For the foregoing reasons, Chevron requests that the Court to issue an order:

(1)    directing Plaintiffs, their counsel, their consultants, and anyone acting in concert with them, as well Respondents, to preserve all potentially relevant evidence, including electronic evidence;

(2)    granting Chevron leave to obtain discovery from Respondents of information provided by the individuals listed in paragraph 1 of the Second Circuit's Order dated July 15, 2010, specifically, any communications between Respondents and any of those individuals, any instances where instructions from or actions by any of those individuals led to cameras being turned off, and what was said or done by any of those individuals when the cameras were turned off; and

(3)    compelling Respondents to provide the original footage log, to provide a complete privilege log describing the contents of all the segments they have withheld as ordered by this Court on July 21, 2010, and to produce any and all remaining footage that shows (a) any of Plaintiffs' attorneys and consultants or their associates, (b) any court-appointed or private experts, and/or (c) any current or former Ecuadorian governmental officials, as ordered by the Second Circuit on July 15, 2010.

Dated: August 3, 2010
New York, New York

GIBSON, DUNN & CRUTCHER LLP

By:  /s/ Randy M. Mastro
Randy M. Mastro

34

200 Park Avenue, 47th Floor
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Scott A. Edelman
2029 Century Park East
Los Angeles, CA 90067
Telephone: 310.552.8500
Facsimile: 310.551.8741

Andrea E. Neuman
3161 Michelson Drive
Irvine, CA 92612
Telephone: 949.451.3800
Facsimile: 949.451.4220

*Attorneys for Applicant Chevron Corporation*