UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
IN RE:                                                    :
                                                          :
Application of CHEVRON                                    :        10 MC 00001 (LAK)
                                                          :
This Document Applies to:  ALL CASES                      :
-------------------------------------------------------------------X


**FILMMAKERS' OPPOSITION TO MOTIONS BY RODRIGO PÉREZ
PALLARES AND RICARDO REIS VEIGA TO COMPEL COMPLIANCE WITH
SUBPOENAS OR, IN THE ALTERNATIVE, TO JOIN MOTION BY CHEVRON
CORPORATION TO SUPPLEMENT AND ENFORCE SUBPOENAS**


Lee Levine (*pro hac vice* applicant)
David A. Schulz
Seth D. Berlin
LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
321 W. 44th Street, Suite 510
New York, NY 10036
Tel: (212) 850-6100
Fax: (212) 850-6299
llevine@lskslaw.com
dschulz@lskslaw.com
sberlin@lskslaw.com

Maura J. Wogan
Jeremy S. Goldman
FRANKFURT KURNIT KLEIN & SELZ, P.C.
488 Madison Avenue, 10th Floor
New York, NY 10022
Tel:  (212) 980-0120
Fax: (212) 593-9175
mwogan@fkks.com
jgoldman@fkks.com

*Attorneys for Respondents Joe Berlinger, Michael
Bonfiglio, Third Eye Motion Picture Company, Inc.,
Crude Productions, LLC and @radical.media LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ....................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.   THE INDIVIDUAL PETITIONERS FAIL TO DEMONSTRATE NON-
     COMPLIANCE OR ESTABLISH ANY FACTUAL BASIS FOR
     ADDITIONAL DISCOVERY ................................................................................ 2

     A.   The Individual Petitioners Wrongly Seek To Portray Mr. Berlinger
          as Acting in Bad Faith ............................................................................... 2

     B.   The Individual Petitioners Wrongly Seek To Portray Mr. Berlinger
          as Biased and Collusive ............................................................................. 6

II.  THE INDIVIDUAL PETITIONERS FAIL TO MEET THEIR BURDENS
     TO OBTAIN FURTHER DISCOVERY OR TO IMPOSE SANCTIONS ........................ 8

     A.   The Individual Petitioners Fail to Establish Any Legal Basis for
          Additional Discovery Under Section 1782 ................................................. 8

     B.   The Individual Petitioners Fail to Establish Any Proper Basis For
          Overcoming the Journalists' Privilege ....................................................... 9

     C.   The Individual Petitioners Fail to Satisfy the Strict Standards for
          Imposing Sanctions .................................................................................. 13

III. ANY LEGITIMATE DISCOVERY DISPUTES SHOULD BE
     REFERRED TO A SPECIAL MASTER ............................................................. 16

CONCLUSION ............................................................................................................. 18

i

## TABLE OF AUTHORITIES
### CASES

*Ametex Fabrics, Inc. v. Just In Materials, Inc.*, No. 94-CV-5226, 1996 WL 428391
(S.D.N.Y. July 31, 1996) ....................................................................................15

*In re Application Pursuant to 28 U.S.C. Section 1782*, 249 F.R.D. 96 (S.D.N.Y. 2008)..............16

*Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124 (S.D.N.Y. 2009)..........................13

*Ayala v. Ayers*, 668 F. Supp. 2d 1248 (S.D. Cal. 2009)...................................................12

*Bayer AG v. Betachem, Inc.*, 173 F.3d 188 (3d Cir. 1999) ............................................16

*In re Campania Chilena de Navegacion*, No. 03-CV-5382, 2004 WL 1084243 (E.D.N.Y.
Feb. 6, 2004) ....................................................................................17

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)....................................................................15

*Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062
(2d Cir. 1979)....................................................................................14, 15

*Curtis Publishing Co. v. Butts*, 388  U.S. 130 (1967).........................................................10, 11

*DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124 (2d Cir. 1998).....................13, 15

*Damiano v. Sony Music Entertainment*, 168 F.R.D. 485 (D.N.J. 1996)........................................11

*Holland v. Centennial Homes, Inc.*, No. 3:92-CV-1533, 1993 WL 755590 (N.D. Tex.
Dec. 21, 1993) ....................................................................................11

*J.J.C. v. Fridell*, 165 F.R.D. 513 (D. Minn. 1995) ....................................................................11

*In re Kidder Peabody Securities Litigation*, 168 F.R.D. 459 (S.D.N.Y. 1996)............................10

*KNXV-TV v. Cooper Tire & Rubber Co.*, 178 P.3d 1176 (Ariz. Ct. App. 2008)..........................11

*In re Letter Rogatory from Local Court of Ludwigsburg, Federal Republic of Germany*,
154 F.R.D. 196 (N.D. Ill. 1994)....................................................................17

*Lonegan v. Hasty*, No. 04-CV-2743, 2008 WL 41445 (E.D.N.Y. Jan. 1, 2008)................9, 11, 12

*Maressa v. New Jersey Monthly*, 445 A.2d 376 (N.J. 1982) .........................................................12

*Maynard v. Nygren*, 332 F.3d 462 (7th Cir. 2003) ....................................................................14

*McNerney v. Archer Daniels Midland Co.*, 164 F.R.D. 584 (W.D.N.Y. 1995) .............................9

*Metropolitan Opera Association, Inc. v. Local 100, Hotel Employees & Restaurant Employees International Union*, 212 F.R.D. 178 (S.D.N.Y. 2003)...................................15

*Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir. 1986).......................................................13

*Outley v. City of New York*, 837 F.2d 587 (2d Cir. 1988)..............................................14

*In re Qwest Communications International Inc.*, No. 3:08-MC-93, 2008 WL 2741111 (W.D.N.C. July 10, 2008) ............................................................................17

*Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002)...............15

*Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71 (2d Cir. 2000)......................................13

*Sassower v. Field*, 973 F.2d 75 (2d Cir. 1992) ...............................................................15

*Schiller v. City of New York*, 245 F.R.D. 112 (S.D.N.Y. 2007).........................................7

*Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323 (2d Cir. 1999) ............................13

*Shafii v. British Airways, PLC*, 83 F.3d 566 (2d Cir. 1996) ..............................................13

*Stephens v. America Home Assurance Co.*, No. 91-CV-2898, 1995 WL 230333 (S.D.N.Y. Apr. 17, 1995)...........................................................................10

*Treppel v. Biovail Corp.*, 249 F.R.D.111 (S.D.N.Y. 2008) ...............................................9

*Velazquez-Rivera v. Sea-Land Serv., Inc.*, 920 F.2d 1072 (1st Cir. 1990) ....................................14

*In re Venezia*, 922 A.2d 1263 (N.J. 2007) ...................................................................12

*In re von Bulow*, 828 F.2d 94 (2d Cir. 1987)..............................................................10

*Williams v. Saint-Gobain Corp.*, No. 00-CV-502, 2002 WL 1477618 (W.D.N.Y. June 28, 2002) ...............................................................................................14

*Wright v. Fred Hutchinson Cancer Research Ctr.*, 206 F.R.D. 679 (W.D. Wash. 2002) ...............7

*Zambrano v. City of Tustin*, 885 F.2d 1473 (9th Cir. 1989) .........................................14

**STATUTES**

28 U.S.C. § 636(b) ...............................................................................................17

28 U.S.C. § 1782 ............................................................................................16, 17

28 U.S.C. § 1927 ...............................................................................................13

Fed. R. Civ. P. 11 ..............................................................................................13

Filmmakers respectfully submit this memorandum in opposition to the motions by Rodrigo Pérez Pallares and Ricardo Reis Veiga (collectively, the "Individual Petitioners") for an order to compel compliance with subpoenas or, in the alternative, to join in Chevron Corporation's August 3, 2010 motion seeking to supplement and enforce subpoenas.

## PRELIMINARY STATEMENT

The Individual Petitioners complain that Mr. Berlinger supposedly has made purposeful misrepresentations to the Court and that "numerous other irregularities"[1] exist in the production of records he made, so that they should now be allowed to conduct open-ended depositions, engage in detailed forensic analyses of his computers, and rummage through his email.  They also claim that, by providing lawyers for the Lago Agrio Plaintiffs with the same outtakes he was ordered to produce to Chevron, Mr. Berlinger has effected a subject matter waiver of the reporter's privilege with respect to any and all aspects of his production of the documentary. Their contentions are out of line—based on unfounded accusations, assumptions and misstatements.

The combined motions fail to establish any non-compliance by the Filmmakers with the Second Circuit order, and utterly fail to establish any factual or legal basis for the claims of waiver and the demands for multiple forms of relief now advanced by the Individual Petitioners. As established in Filmmakers' opposition to Chevron's earlier request for similar relief—relief that is beyond the jurisdiction of this Court to grant in any event—it is high time to bring this proceeding to a close by addressing any remaining discovery needs of the Petitioners, if any truly legitimate needs remain.

---

[1] Memorandum in Support of Rodrigo Pérez Pallares' Motion for an Order Compelling Compliance with Subpoenas (Dkt. #35) at 2 (hereinafter "Pérez Mem.").

1

Having litigated fully the scope of his privilege, the Filmmakers have accepted the Court's ruling and have now produced more than 85% (450 hours) of their total outtakes. They have voluntarily turned over duplicate audio tapes requested by Chevron, provided their logs of the outtakes to assist Petitioners in making sense of them, answered many questions about the production, and corrected errors as they realized them. In response, Petitioners seek to take advantage of the few inevitable missteps by Mr. Berlinger in his efforts to comply with a large production in a short timeframe. The allegations of misconduct, bad faith and abuse are unsupported by the facts. Any dispute over the remaining discovery needs of Chevron and its lawyers should have been something the parties could resolve without the continuous filing of motion papers intended for public consumption. Particularly given Filmmakers' expressed willingness to allow *all* of the remaining outtakes to be reviewed on a confidential, non-waiver basis, the parties should be directed to negotiate any remaining discovery-related issues, and a magistrate or special master appointed in the event that any issue arises where agreement cannot be reached.

## ARGUMENT

### I.

### THE INDIVIDUAL PETITIONERS FAIL TO DEMONSTRATE NON-COMPLIANCE OR TO ESTABLISH ANY FACTUAL BASIS FOR ADDITIONAL DISCOVERY

The latest motion papers continue seriously to distort the factual record. The ongoing assertions of non-compliance and bad faith cannot withstand scrutiny.

**A.    The Individual Petitioners Wrongly Seek To Portray Mr. Berlinger as Acting in Bad Faith**

The latest motions renew and amplify assertions previously by Chevron, but in a manner so shrill and untethered to any factual record, that they should not be taken at face value. The *record facts* establish that:

2

- Filmmakers have now produced to Chevron and its lawyers a total of 446 full tapes and 16 partial tapes, out of the total 526 tapes recorded during the production of *Crude*.  Berlinger Decl. III, ¶¶ 3-10.  Just 64 tapes fell outside the scope of the Second Circuit's order, and Filmmakers have offered to allow Petitioners counsel to review even these, on a confidential, non-waiver basis, to verify their full compliance.[2]

- The 526 tapes reviewed for production constitute the entire universe of outtakes recorded by Filmmakers.  *Id.* ¶ 10.  The number of videotapes recorded is documented by a contemporaneous log maintained throughout the production of *Crude*.  And this log *also* has been voluntarily turned over to Petitioners in native, electronic format, so Petitioners can verify for themselves that no entries were altered or changed since the end of production in early 2009.  *Id.* ¶ 18.

- Filmmakers have responded promptly to questions raised and have repeatedly adjusted their schedules and sacrificed their time to satisfy the continuing demands of Chevron and its lawyers.  *Id.* ¶¶ 12-19.  They have corrected the inevitable errors and produced all tapes contemplated by the Second Circuit's order.

The ongoing effort to distort these good faith efforts by an independent third-party witness is unjustified, improper and counter-productive.

### 1.    The outtakes "regarding the criminal prosecutions."

The center of the latest request for relief is the contention that Mr. Berlinger knowingly and willfully misled the Court in a sworn declaration stating that the outtakes contained "no material regarding the criminal prosecutions in general or specifically against Messrs. Pérez and Reis Veiga."  (Berlinger Decl. I, ¶ 35.)  Mr. Berlinger's statement was overbroad and overlooked some references that the plaintiffs now cite.  There is obviously a subjective quality to identifying comments in the outtakes that the Petitioners would consider to be "regarding the criminal prosecutions," and we regard the majority of the few references they now cite as strained, but Petitioners do identify at least two passing references to potential prosecutions that the Ecuadorean plaintiffs wanted to see brought by the Government.  That Mr. Berlinger did not

---

[2] The Filmmakers also provided Chevron with a privilege log, as the Court directed, concerning the 64 withheld tapes.

recall or recognize the relevance of these references, however, does not evince bad faith or an affirmative desire to mislead. Mr. Berlinger's statement was based on his knowledge that the criminal prosecutions were never a focus of the documentary, and the collective recollection of the Filmmakers about the content of the hundreds of hours of tapes recorded years earlier.

The Individual Petitioners stretch to claim that such inconsequential comments as the statement by Plaintiffs' lawyers that "for a couple of years we've been trying to get the Attorney General . . . to do something," or that the Attorney General should be in charge of the case, as material "regarding" criminal prosecutions, and even claim that someone voicing the opinion that "what Texaco did . . . was really a crime" should have been noted by Mr. Berlinger. *See* Pérez Mem. at 9-11. They also claim that outtakes showing interactions between the independent damages expert and Plaintiffs' counsel are "regarding" their criminal prosecutions, because "Cabrera's work, of course, is one of the central foundations of the accusation against Messrs. Pérez and Veiga." *Id.* at 8. Such sophistry misconstrues the intent of Mr. Berlinger's comment and provides no evidence of either mistake or malice.

There is in fact some footage among the 450 hours of outtakes that concerns future potential prosecutions. For example, in one meeting Mr. Fajardo mentions in passing the possibility of "re-opening the [criminal] investigation." *See* Hendricks Decl., Aug. 12, 2010 at ¶28, CRS-376-03-CLIP01. Had Mr. Berlinger recognized the existence of such comments as this one, he would have tempered his statement accordingly. But, there was never any concerted effort to conceal any of this material. Even though Mr. Berlinger did not believe he had video outtakes regarding the criminal prosecutions, he volunteered—*before* the Second Circuit's ruling—to allow the Individual Petitioners to inspect those outtakes where any such comments were most likely to appear, if they had been captured at all. *See* Berlinger Dec. II, ¶ 16 and Ex.

N (annexed as Ex. AA to Berlinger Decl. IV).  And the few instances now trumpeted by the

Individual Petitioners were all contained among *the very first batch* of videotapes produced to

Chevron.  *See* Berglinger Decl. III, Exs. A-C (dates of delivery of outtakes).  These actions do

not suggest any affirmative effort to conceal these clips.  They demonstrate the opposite.

Chevron's lawyers wrongly seek to transform an innocent error into a purposeful "effort

to keep this evidence hidden."  Pérez Mem. at 20, 13.  The record does not support this claim.

Nor is there any evidence to support Mr. Pérez's assertion that Mr. Berlinger followed

"Plaintiffs' direction to him to erase footage, conceal and otherwise alter the outtakes," or his

suggestion that Mr. Berlinger's conduct is "dangerously close to the federal crime of

misprision," an accusation hurled without a single citation to the record.  Opp. at 16 (citing 18

U.S.C. § 4).  Such accusations are particularly unwarranted and unfair coming from individuals

who claim to be wrongfully accused of criminal conduct themselves.

> **2.    The total numbers of outtakes.**

The Individual Petitioners attempt to suggest that some question remains about the total

number of outtakes recorded during the production of the documentary.  They do not.  While

rough approximations of the total number of hours of videotape were made early in this

proceeding, there is no uncertainty whatsoever about the actual number of videotapes.  They are

documented in a contemporaneously maintained production log, which has itself been

voluntarily produced.  *See* Filmmaker Respondents' Supplemental Memorandum in Opposition

to Chevron's Motion to Supplement and Enforce Subpoenas at 5 & n.4.

To suggest uncertainty, Mr. Pérez simply ignores the facts and miscites the record.  He

claims that Mr. Berlinger originally said there were only 518 tapes, but the very evidence he cites

shows the total to be 520.  Pérez Mem. at 17 (citing Dans Decl. Ex. 9 at 2 (describing 520

tapes)).  He then says the number was changed to 522 (*id.*, *citing* Dans Decl. Ex. 10 at 2), but

omits the explanation for the increase in the count that was provided by Mr. Berlinger—he

discovered that in two instances entries on the log recorded *two* tapes under a single number.

(*Id.,* explaining that the log contained both a 279A and 279B as well as a 445A and 445B).  The

total count became 526 when four *audio* tapes included in the log were added to the count.  All

of this can readily be confirmed from the contemporaneous log produced weeks ago.

> **3.     The production log.**

Recognizing that the outtake log fully rebuts their effort to manufacture confusion, the

Individual Petitioners attack the log itself, once again making serious accusations that are not

borne out by the facts.  Mr. Pérez asserts that the log provided by Mr. Berlinger is "not the

original," but one "created or altered after the filing of these Applications," Pérez Mem. at 16,

but relies solely on an earlier discussion of the log by Chevron—a discussion already shown to

be wrong.  Berlinger Decl. III, ¶ 18; Respondents Memorandum in Further Opposition to

Chevron's Motion (Dkt. 27) at 4.

The bottom line is that the Filmmakers have voluntarily made the log available in its

native, electronic format, from which it can readily be discerned that no revisions have been

made since production of the film ended on January 16, 2009.  *See* Berlinger Decl. IV, ¶16, n. 4.

Mr. Pérez even demands a forensic analysis of the Filmmakers' computers without providing *any*

evidence that the log was altered—something the log itself would reveal.

> **B.     The Individual Petitioners Wrongly Seek To**
> **Portray Mr. Berlinger as Biased and Collusive**

Despite Petitioners' best efforts to suggest the contrary, the Filmmakers have no vested

interest in the underlying dispute between Chevron and the Lago Agrio Plaintiffs.  During

production, Filmmakers offered both sides the same terms and same considerations for their

cooperation and for access, including the right to direct that the camera be turned off during

closed meetings if a confidential issue arose, the right to review and comment upon an early version of the documentary, and even an invitation to attend the Sundance film festival where *Crude* premiered to critical acclaim.  Each side was offered the same terms and considerations in exchange for access to their meetings and events.  Plaintiffs' counsel accepted broadly; Chevron largely did not.  Berlinger Dec. II, ¶¶ 6-9.[3]

The whole issue of bias is a red-herring in any event, irrelevant to the legal issues before the Court concerning compliance with the Second Circuit order and the scope of the reporter's privilege.  The "touchstone" for application of the journalist's privilege is not whether the person invoking it is "unbiased" because, "by that standard, few, if any, [journalists] could assert the privilege."  *Schiller v. City of New York*, 245 F.R.D. 112, 119 (S.D.N.Y. 2007).  The First Amendment does not require "journalists to refrain from drawing conclusions or holding opinions about the subjects on which they are reporting as a prerequisite to protection from compelled disclosure."  *Wright v. Fred Hutchinson Cancer Research Ctr.*, 206 F.R.D. 679, 681 (W.D. Wash. 2002).  As one federal court observed in upholding the journalist's privilege:

> The First Amendment does not favor "objective" reporting, nor is it limited to statements which contain only proven facts. The opinionated, one-sided, and issue-oriented writings found in the Federalist Papers, abolitionist newspapers, and communist dailies are all entitled to First Amendment protections, regardless of the bias of the authors.

*Wright*, 206 F.R.D. at 681 n.2.

The personal attack on the Filmmakers in both unfounded and irrelevant.

---

[3] The whole issue of bias appears to be just another litigation tactic.  While not opening up to the extent that Plaintiff's did, Chevron's public relations representative remained in contact with the Filmmakers throughout production.  When the film was released Chevron never objected that it was biased or failed adequately to present Chevron's positions concerning the proceeding in Ecuador.

**II.**

**THE INDIVIDUAL PETITIONERS FAIL TO MEET
THEIR BURDENS TO OBTAIN FURTHER
DISCOVERY OR TO IMPOSE SANCTIONS**

All apart from the paucity of record evidence to support the allegations of misconduct put forward by the Individual Petitioners, they completely fail to meet the legal burdens that they must carry to obtain the further relief they seek.

**A.      The Individual Petitioners Fail to Establish Any Legal
Basis for Additional Discovery Under Section 1782**

The Individual Petitioners ratchet up the rhetoric and demand even more intrusive disclosures than sought by Chevron.  Mr. Pérez seeks (1) wide ranging depositions "about the filming of *Crude*, the creation, maintenance and documentation of the film footage, the events observed by the movie crew during filming and subpoena compliance to date"; (2) access to "any of respondents' computers on which the original native format of the tape log was created or maintained"; and (3) production of "all documents related to instructions by plaintiffs not to film certain events or to otherwise conceal, erase or dispose of footage previously recorded."  Pérez Mem. at 21-22.  This overreaching request is defective as a matter of law, for multiple reasons.

*First*, as noted in Filmmakers' opposition to Chevron's companion motion, this Court lacks jurisdiction to entertain new requests for additional forms of relief beyond the Second Circuit's order.  Resp. Mem. in Further Opp. to Chevron Motion (Dkt. 27) at 6.  This case is presently before this Court on limited remand to resolve "[a]ny disputes related to the performance of" the July 15, 2010 Order, which directs only the production of certain outtakes.

*Second*, as demonstrated above, the Individual Petitioners provide no competent evidence of any non-compliance.  All the tapes recorded by Filmmakers have been made available for inspection as the Second Circuit ordered.

*Third*, even if the record warranted some further disclosure (and it does not), the appropriate remedy would be targeted discovery designed to elicit any additional responsive material.  *See Treppel v. Biovail Corp.*, 249 F.R.D.111, 117-18 (S.D.N.Y. 2008) (ordering defendant to search three particular back-up email server tapes where emails produced suggested that similar relevant emails were likely to be contained on those server tapes).  The Individual Petitioners' request for wide-ranging additional discovery—on topics as broad as "the filming of *Crude*" and "events observed by the movie crew"—is wildly unreasonable and should properly be denied.  *See id.* at 120; *cf. McNerney v. Archer Daniels Midland Co.*, 164 F.R.D. 584, 587 (W.D.N.Y. 1995) (precluding testimony from expert witness was "too drastic" a remedy for failure to timely produce it).

**B.      The Individual Petitioners Fail to Establish Any Proper
           Basis For Overcoming the Journalists' Privilege**

The Individual Petitioners are equally off-base in arguing that Berlinger has somehow "given up any claim" to the reporter's privilege with regard to other material—namely, information learned under a promise of confidentiality when the cameras were turned off—by voluntarily providing Chevron's opponents in the Ecuadorean litigation with the *very same footage the Second Circuit ordered him to disclose.*  Pérez Mem. at 14.  Simply put, there is no "subject matter" waiver of the reporters' privilege, and with good reason.

In this Circuit, waivers of testimonial privileges are recognized only in situations where, unlike here, the privilege-holder has engaged in selective disclosure of privileged information as a self-serving litigation tactic.  *See Lonegan v. Hasty*, No. 04-CV-2743, 2008 WL 41445, at *5 (E.D.N.Y. Jan. 1, 2008) ("[A]ny waiver by partial disclosure typically applies only when a party is attempting to gain some tactical advantage by a partial disclosure . . . .").  In its seminal case on the subject, the Second Circuit found no subject matter waiver of the attorney-client privilege

in circumstances where a famed criminal defendant "knew of, consented to, and actually encouraged [his] attorney . . . to write a book providing an 'insider look' into his case," had been "warned before publication that such an act might trigger a waiver and, yet, took no active measures to preserve his confidences," but instead "joined his attorney in enthusiastically promoting the book on television and radio shows." *In re von Bulow*, 828 F.2d 94, 100 (2d Cir. 1987). In *von Bulow*, the Court of Appeals observed that implied waivers of privilege are recognized to promote "fairness" in litigation and deter the "distortion of the judicial process that may be caused by the privilege-holder's selective disclosure *during litigation* of otherwise privileged information." *Id.* at 101 (emphasis added). That fairness principle simply "does not come into play" when disclosures are made outside of legal proceedings and are not placed at issue by the privilege-holder during litigation. *Id.* at 102. In such circumstances, the extrajudicial disclosure of privileged information *does not* impair the privilege-holder's right to assert the privilege with regard to any "undisclosed portions" concerning the same subject. *Id.* at 102-03. *See also In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 469 (S.D.N.Y. 1996) ("[W]e are constrained by *von Bulow* to conclude that [extrajudicial] issuance of the . . . report constitutes a waiver of the privilege only for the communications or portions of communications disclosed in the report.") (cited in Pérez Mem. at 14).[4]

In the specific context of the reporter's privilege, this principle applies with even greater force, because the Supreme Court has cautioned courts not lightly to infer waivers that would result in the surrender of First Amendment-based privileges. *See Curtis Publ'g Co. v. Butts*, 388

---

[4] The question of whether Berlinger may have waived the right to invoke the reporter's privilege in the future with regard to the *specific footage* he voluntarily disclosed to the plaintiffs—after being ordered to disclose it to the Chevron defendants—is not presented here, and Berlinger does not concede such a waiver. *See Stephens v. Am. Home Assurance Co.*, No. 91-CV-2898, 1995 WL 230333, at *4 n.17 (S.D.N.Y. Apr. 17, 1995) ("[D]isclosures in [other] litigation do not preclude [publishing company's] assertion of the reporter's privilege in this case.").

U.S. 130, 145 (1967) ("Where the ultimate effect of sustaining a claim of waiver might be an imposition on [the constitutional rights of the press], we are unwilling to find waiver in circumstances which fall short of being clear and compelling.").  Moreover, unlike most testimonial privileges, which are focused on preserving the confidentiality of certain sacrosanct relationships, the reporter's privilege is recognized for reasons that go beyond preserving confidences.  *See, e.g., Lonegan v. Hasty*, 2008 WL 41445, at *2 (the reporter's privilege developed "in recognition of the heavy burdens that would be placed on the press if litigants were free to rummage through journalists' files whenever a matter that had received attention in the press became the subject of litigation"); *Damiano v. Sony Music Entm't*, 168 F.R.D. 485, 499 (D.N.J. 1996) ("the issue of confidentiality is not the exclusive rationale behind the reporter's privilege," which seeks to promote other public interests).

Journalists simply do not surrender their privileges by revealing some of their work product to third parties.  *See, e.g., Damiano*, 168 F.R.D. at 498-500 (journalist did not waive reporter's privilege by conducting tape-recorded interview in presence of interviewee's publicist); *J.J.C. v. Fridell*, 165 F.R.D. 513, 516-18 (D. Minn. 1995) (newspaper's disclosure that individual was not source for story did not open the door to discovery of the source's identity or unpublished information that might reveal it); *KNXV-TV v. Cooper Tire & Rubber Co.*, 178 P.3d 1176, 1182-83 (Ariz. Ct. App. 2008) (rejecting argument that news organization waived reporter's privilege "by making disclosures about the source without specifically identifying the person").  Nor is the principle any different when a reporter reveals information to a litigant.  *See Holland v. Centennial Homes, Inc.*, No. 3:92-CV-1533, 1993 WL 755590, at *5 (N.D. Tex. Dec. 21, 1993) (rejecting argument that reporter tacitly waived privilege when she "intentionally inserted herself into the lawsuit").

The Individual Petitioners provide no authority that supports their contrary theory of waiver.  The extensive reliance by Mr. Pérez on *In re Venezia*, 922 A.2d 1263 (N.J. 2007), is entirely misplaced (not to mention inapposite, since it is an interpretation of inapplicable state law).  *See* Pérez Mem. at 14-15 & n.25.  Although he quotes at length from of *Venezia*'s discussion of waiver, Mr. Pérez fails to reveal that the New Jersey court's *holding* in that case actually stands for the proposition that a reporter can be compelled to reveal otherwise-privileged information, based on a waiver theory, when the journalist already has revealed "*that same information*" to other third parties.  922 A.2d at 1274 (emphasis added).  *Venezia* did not disturb the New Jersey Supreme Court's long-standing holding that a journalist's dissemination of privileged information to a third party "constitutes a waiver *only as to that specific information*" and that such a waiver "does not operate as to *any non-disclosed information*."  *Maressa v. N.J. Monthly*, 445 A.2d 376, 386 (N.J. 1982) (emphasis added).  *See In re Venezia*, 922 A.2d at 1272 (quoting *Maressa*).  The only other waiver case cited by Mr. Pérez that addresses the reporter's privilege, *Ayala v. Ayers*, similarly found waiver only "with respect to *this same material*" that had previously been released to others.  668 F. Supp. 2d 1248, 1250-51 (S.D. Cal. 2009) (emphasis added).

Here, Mr. Berlinger did no more than produce to plaintiffs' counsel the *exact same* privileged material he was ordered to provide to Chevron.  His actions, as a non-party, can in no sense be considered a selective disclosure for litigation advantage, and the disclosure is of no consequence to the Filmmakers' right to continue to assert a privilege as to *other materials or information that has not been disclosed*.  In short, Mr. Pérez has failed to meet his burden of establishing that Filmmakers waived their privilege.  *See Lonegan*, 2008 WL 41445, at *5 (party seeking to overcome reporter's privilege bears burden of demonstrating waiver).

**C.     The Individual Petitioners Fail to Satisfy the
         Strict Standards for Imposing Sanctions**

Attempting to bootstrap his own distortions of the record into sanctionable conduct by

Mr. Berlinger, Mr. Pérez contends that statements about the absence of outtakes "regarding the

criminal prosecution" were "either deliberate lies or reckless falsehoods," and asks the Court to

use its inherent power to levy sanctions.  Pérez Mem. at 20.[5]  The request is wholly without

merit.

"An award of sanctions under the court's inherent power requires both 'clear evidence

that the challenged actions are *entirely without color*, and [are taken] for reasons of harassment

or delay or for other improper purposes.'"  *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 78

(2d Cir. 2000) (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986)) (internal

quotation marks omitted) (emphasis added).  *See Arista Records LLC v. Usenet.com, Inc.*, 633 F.

Supp. 2d 124, 138 (S.D.N.Y. 2009) ("sanctions under the court's inherent power require a

showing of bad faith or willfulness"); *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124,

136 (2d Cir. 1998) (same).  To determine whether challenged conduct is "colorable," the Second

Circuit has instructed that a court must consider "'the reasonable beliefs of the individual'" who

engaged in the conduct.  *Revson*, 221 F.3d at 78-79 (emphasis omitted).  Bad faith may be

inferred "'only if actions are so completely without merit as to require the conclusion that they

must have been undertaken for some improper purpose such as delay.'"  *Schlaifer Nance & Co.,

Inc. v. Estate of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999) (quoting *Shafii v. British Airways,

PLC*, 83 F.3d 566, 571 (2d Cir. 1996) (internal quotation marks omitted)).  As discussed above,

no such evidence of bad faith or improper motive exists in this case.

---

[5]  Mr. Pérez references 28 U.S.C. § 1927 and Fed. R. Civ. P. 11, but makes clear that he seeks
the Court to enter sanctions solely under its "inherent power."  *See* Pérez Mem. at 20-21.

Mr. Berlinger's overly broad statement was made in the course of a good faith effort to protect his constitutional privilege. Even before the issue was resolved by the Court of Appeals, he offered to allow a limited review of the outtakes to search for information relating to the criminal prosecutions, and the outtakes were promptly produced after the Second Circuit ruled—there was no effort whatsoever to hide information that would either help the Lago Agrio Plaintiffs' position or hurt Chevron. *See* Berlinger Dec. II, ¶ 16; Berlinger Dec. III, Exs. A-C. Sanctions are not properly imposed for such innocent mistakes made in the course of litigation, including during the discovery process. *See, e.g.*, *Maynard v. Nygren*, 332 F.3d 462, 470-71 (7th Cir. 2003) (reversing award of sanctions for failing to provide material in discovery where no finding of willfulness); *Zambrano v. City of Tustin*, 885 F.2d 1473, 1484 (9th Cir. 1989) (vacating award of sanctions because there was "no indication in the record that counsel were guilty of anything more than simple negligence"); *see also, e.g.*, *Velazquez-Rivera v. Sea-Land Serv., Inc.*, 920 F.2d 1072, 1076-78 (1st Cir. 1990) (vacating award of sanctions where plaintiff's conduct did not evince "purpose or bad faith").

Courts in this Circuit regularly reject demands for sanctions for the types of mistakes that occurred here. For example, in *Williams v. Saint-Gobain Corp.*, the Western District was faced with a motion for sanctions where a party failed to produce documentary evidence. No. 00-CV-502, 2002 WL 1477618, at *1-2 (W.D.N.Y. June 28, 2002). The court declined to order sanctions because the party produced the materials as soon as it realized its error and there was "no evidence of any bad faith as to any withholding or destruction of same." *Id.* at *2. *See also Outley v. City of New York*, 837 F.2d 587, 590-591 (2d Cir. 1988) (reversing imposition of a trial sanction arising out of a good faith discovery mistake); *Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979) ("courts [should] eschew the

14

harshest sanctions" where a failure to comply "is due to a mere oversight of counsel amounting to no more than simple negligence").

Once again, none of the cases Mr. Pérez cites supports the relief he seeks.  Each involved parties and/or attorneys who, unlike here, made knowing and intentional falsehoods, perpetrated an intentional fraud on the court, or engaged in extensive patterns of vexatious litigation.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 36-42, 54-58 (1991) (sanctions against party who perpetrated "a fraud upon the court" through intentional misrepresentations); *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 112 (2d Cir. 2002) (remanding for reconsideration of sanctions where there was evidence of "a deliberate attempt to mislead" the court); *DLC Mgmt. Corp.*, 163 F.3d at 136 (2d Cir. 1998) (affirming sanctions where defendants acted in "'conscious disregard of their discovery obligations'") (citation omitted); *Sassower v. Field*, 973 F.2d 75, 78, 81 (2d Cir. 1992) (affirming sanctions against parties who engaged in "numerous instances of entirely vexatious and oppressive tactics"); *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Employees Int'l Union*, 212 F.R.D. 178, 186, 222 (S.D.N.Y. 2003) (awarding sanctions where attorneys made "aggressively willful" false statements to court); *Ametex Fabrics, Inc. v. Just In Materials, Inc.*, No. 94-CV-5226, 1996 WL 428391, at *5 (S.D.N.Y. July 31, 1996) (imposing sanctions upon finding of "bad faith" presentation of "false and misleading statements" to the court).

The record here negates the claim of bad faith advanced by the Individual Petitioners.  As previously presented, the actions taken by the Filmmakers to satisfy the legitimate needs of the Petitioners have included:

- Offering even before the Second Circuit ruled to allow the Individual Petitioners to review outtakes to look for references to criminal prosecutions.

- Reviewing hundreds of hours of outtakes and turning over nearly 85% of them promptly after the Second Circuit ruled.

- Providing 200 tapes on an expedited basis under a "claw-back" provision.

- Voluntarily surrendering a copy of the footage log.

- Voluntarily surrendering the footage log in electronic format.

- Voluntarily providing duplicate audio tapes requested by Petitioners.

- Voluntarily re-submitting tapes to Petitioners to allow them to correct their mistakes.

- Offering to allow all non-disclosed outtakes to be reviewed on a non-waiver basis.

*See generally* Berlinger Dec. III, ¶¶ 3-19; Berlinger Dec. IV, ¶¶ 16-18.  This is not a record of bad faith.  The request for sanctions should properly be denied.

### III.
### ANY LEGITIMATE DISCOVERY DISPUTES SHOULD BE REFERRED TO A SPECIAL MASTER

Cutting through the rhetoric, and even putting aside jurisdictional limitations, the Individual Petitioners advance no basis for broad-based discovery into Filmmakers' production practices, methods of operating or relationships with sources.  The only proper area for discovery under their 28 U.S.C. § 1782 Applications is into matters relevant to the foreign proceedings. *See, e.g., In re Application Pursuant to 28 U.S.C. Section 1782*, 249 F.R.D. 96, 106 (S.D.N.Y. 2008) ("proper scope of the discovery sought under section 1782, like all federal discovery, is governed by Federal Rule 26(b)"); *Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 192 (3d Cir. 1999) (same).

Since Chevron filed its most recent motion, Filmmakers have offered repeatedly to discuss directly with Chevron and the Individual Petitioners any discovery legitimately relevant to the foreign litigation.  The counter-productive motions for over-reaching relief should be denied and the parties referred to a magistrate or special master to resolve any disputes

concerning relevant discovery in the possession of Filmmakers. *See In re Campania Chilena de Navegacion*, No. 03-CV-5382, 2004 WL 1084243, at *1 (E.D.N.Y. Feb. 6, 2004) (district court may designate magistrate judge to determine any "pretrial matter," including petition for discovery pursuant to 28 U.S.C. § 1782); *In re Qwest Commc'ns Int'l Inc.*, No. 3:08-MC-93, 2008 WL 2741111, at *3 (W.D.N.C. July 10, 2008) (jurisdiction exists under 28 U.S.C. § 636(b) for magistrate judge, upon referral from district court, to resolve petition for discovery order pursuant to 28 U.S.C. § 1782); *In re Letter Rogatory from Local Court of Ludwigsburg, Fed. Republic of Germany*, 154 F.R.D. 196, 200 (N.D. Ill. 1994) ("[A] United States Magistrate Judge, acting as a commissioner pursuant to the Convention on the Taking of Evidence Abroad, has discretion to grant or deny a letter rogatory request for assistance in obtaining evidence [pursuant to 28 U.S.C. § 1782].").

## CONCLUSION

For each and all the foregoing reasons, Mr. Pérez's motion should be denied in its

entirety.

Dated:  August 27, 2010
        New York, New York

Respectfully submitted,

   /s/ David A. Schulz
Lee Levine (*pro hac vice* applicant)
David A. Schulz
Seth D. Berlin
LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
321 W. 44th Street, Suite 510
New York, NY 10036
Tel: (212) 850-6100
Fax: (212) 850-6299
llevine@lskslaw.com
dschulz@lskslaw.com
sberlin@lskslaw.com

Maura J. Wogan
Jeremy S. Goldman
FRANKFURT KURNIT KLEIN & SELZ, P.C.
488 Madison Avenue, 10th Floor
New York, NY 10022
Tel:  (212) 980-0120
Fax: (212) 593-9175
mwogan@fkks.com
jgoldman@fkks.com

*Attorneys for Respondents*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
IN RE:                                                          :
                                                                :
Application of CHEVRON                                          :      10 MC 00001 (LAK)
                                                                :
This Document Applies to:  ALL CASES                            :
-----------------------------------------------------------------X


**FILMMAKERS' OPPOSITION TO MOTIONS BY RODRIGO PÉREZ
PALLARES AND RICARDO REIS VEIGA TO COMPEL COMPLIANCE WITH
SUBPOENAS OR, IN THE ALTERNATIVE, TO JOIN MOTION BY CHEVRON
CORPORATION TO SUPPLEMENT AND ENFORCE SUBPOENAS**

Lee Levine (*pro hac vice* applicant)
David A. Schulz
Seth D. Berlin
LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
321 W. 44th Street, Suite 510
New York, NY 10036
Tel: (212) 850-6100
Fax: (212) 850-6299
llevine@lskslaw.com
dschulz@lskslaw.com
sberlin@lskslaw.com

Maura J. Wogan
Jeremy S. Goldman
FRANKFURT KURNIT KLEIN & SELZ, P.C.
488 Madison Avenue, 10th Floor
New York, NY 10022
Tel:  (212) 980-0120
Fax: (212) 593-9175
mwogan@fkks.com
jgoldman@fkks.com

*Attorneys for Respondents Joe Berlinger, Michael
Bonfiglio, Third Eye Motion Picture Company, Inc.,
Crude Productions, LLC and @radical.media LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ...........................................................................1

ARGUMENT ......................................................................................................2

I.  THE INDIVIDUAL PETITIONERS FAIL TO DEMONSTRATE NON-
    COMPLIANCE OR ESTABLISH ANY FACTUAL BASIS FOR
    ADDITIONAL DISCOVERY..........................................................................2

    A.  The Individual Petitioners Wrongly Seek To Portray Mr. Berlinger
        as Acting in Bad Faith..........................................................................2

    B.  The Individual Petitioners Wrongly Seek To Portray Mr. Berlinger
        as Biased and Collusive ........................................................................6

II. THE INDIVIDUAL PETITIONERS FAIL TO MEET THEIR BURDENS
    TO OBTAIN FURTHER DISCOVERY OR TO IMPOSE SANCTIONS.........8

    A.  The Individual Petitioners Fail to Establish Any Legal Basis for
        Additional Discovery Under Section 1782 ...........................................8

    B.  The Individual Petitioners Fail to Establish Any Proper Basis For
        Overcoming the Journalists' Privilege...................................................9

    C.  The Individual Petitioners Fail to Satisfy the Strict Standards for
        Imposing Sanctions..............................................................................13

III. ANY LEGITIMATE DISCOVERY DISPUTES SHOULD BE
     REFERRED TO A SPECIAL MASTER .......................................................16

CONCLUSION.....................................................................................................18

## TABLE OF AUTHORITIES
### CASES

*Ametex Fabrics, Inc. v. Just In Materials, Inc.*, No. 94-CV-5226, 1996 WL 428391
(S.D.N.Y. July 31, 1996) ........................................................................................15

*In re Application Pursuant to 28 U.S.C. Section 1782*, 249 F.R.D. 96 (S.D.N.Y. 2008)..............16

*Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124 (S.D.N.Y. 2009)..........................13

*Ayala v. Ayers*, 668 F. Supp. 2d 1248 (S.D. Cal. 2009)....................................................................12

*Bayer AG v. Betachem, Inc.*, 173 F.3d 188 (3d Cir. 1999) ............................................................16

*In re Campania Chilena de Navegacion*, No. 03-CV-5382, 2004 WL 1084243 (E.D.N.Y.
Feb. 6, 2004) ........................................................................................................17

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).................................................................................15

*Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062
(2d Cir. 1979)...............................................................................................14, 15

*Curtis Publishing Co. v. Butts*, 388  U.S. 130 (1967)...................................................................10, 11

*DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124 (2d Cir. 1998)......................13, 15

*Damiano v. Sony Music Entertainment*, 168 F.R.D. 485 (D.N.J. 1996)........................................11

*Holland v. Centennial Homes, Inc.*, No. 3:92-CV-1533, 1993 WL 755590 (N.D. Tex.
Dec. 21, 1993)........................................................................................................11

*J.J.C. v. Fridell*, 165 F.R.D. 513 (D. Minn. 1995) .........................................................................11

*In re Kidder Peabody Securities Litigation*, 168 F.R.D. 459 (S.D.N.Y. 1996)............................10

*KNXV-TV v. Cooper Tire & Rubber Co.*, 178 P.3d 1176 (Ariz. Ct. App. 2008)..........................11

*In re Letter Rogatory from Local Court of Ludwigsburg, Federal Republic of Germany*,
154 F.R.D. 196 (N.D. Ill. 1994)...........................................................................17

*Lonegan v. Hasty*, No. 04-CV-2743, 2008 WL 41445 (E.D.N.Y. Jan. 1, 2008)................9, 11, 12

*Maressa v. New Jersey Monthly*, 445 A.2d 376 (N.J. 1982) .........................................................12

*Maynard v. Nygren*, 332 F.3d 462 (7th Cir. 2003) .......................................................................14

*McNerney v. Archer Daniels Midland Co.*, 164 F.R.D. 584 (W.D.N.Y. 1995) .............................9

*Metropolitan Opera Association, Inc. v. Local 100, Hotel Employees & Restaurant Employees International Union*, 212 F.R.D. 178 (S.D.N.Y. 2003)...................................15

*Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir. 1986)........................................................13

*Outley v. City of New York*, 837 F.2d 587 (2d Cir. 1988)................................................14

*In re Qwest Communications International Inc.*, No. 3:08-MC-93, 2008 WL 2741111 (W.D.N.C. July 10, 2008) ...............................................................................17

*Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002)...............15

*Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71 (2d Cir. 2000)........................................13

*Sassower v. Field*, 973 F.2d 75 (2d Cir. 1992) .............................................................15

*Schiller v. City of New York*, 245 F.R.D. 112 (S.D.N.Y. 2007)........................................7

*Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323 (2d Cir. 1999) ...........................13

*Shafii v. British Airways, PLC*, 83 F.3d 566 (2d Cir. 1996) ..............................................13

*Stephens v. America Home Assurance Co.*, No. 91-CV-2898, 1995 WL 230333 (S.D.N.Y. Apr. 17, 1995)...........................................................................10

*Treppel v. Biovail Corp.*, 249 F.R.D.111 (S.D.N.Y. 2008) ..............................................9

*Velazquez-Rivera v. Sea-Land Serv., Inc.*, 920 F.2d 1072 (1st Cir. 1990) ...................................14

*In re Venezia*, 922 A.2d 1263 (N.J. 2007) ....................................................................12

*In re von Bulow*, 828 F.2d 94 (2d Cir. 1987)................................................................10

*Williams v. Saint-Gobain Corp.*, No. 00-CV-502, 2002 WL 1477618 (W.D.N.Y. June 28, 2002) ................................................................................................14

*Wright v. Fred Hutchinson Cancer Research Ctr.*, 206 F.R.D. 679 (W.D. Wash. 2002) ...............7

*Zambrano v. City of Tustin*, 885 F.2d 1473 (9th Cir. 1989) ...........................................14

**STATUTES**

28 U.S.C. § 636(b) ..................................................................................................17

28 U.S.C. § 1782 ..............................................................................................16, 17

28 U.S.C. § 1927 ..................................................................................................13

Fed. R. Civ. P. 11 ................................................................................................13

Filmmakers respectfully submit this memorandum in opposition to the motions by Rodrigo Pérez Pallares and Ricardo Reis Veiga (collectively, the "Individual Petitioners") for an order to compel compliance with subpoenas or, in the alternative, to join in Chevron Corporation's August 3, 2010 motion seeking to supplement and enforce subpoenas.

## PRELIMINARY STATEMENT

The Individual Petitioners complain that Mr. Berlinger supposedly has made purposeful misrepresentations to the Court and that "numerous other irregularities"[1] exist in the production of records he made, so that they should now be allowed to conduct open-ended depositions, engage in detailed forensic analyses of his computers, and rummage through his email.  They also claim that, by providing lawyers for the Lago Agrio Plaintiffs with the same outtakes he was ordered to produce to Chevron, Mr. Berlinger has effected a subject matter waiver of the reporter's privilege with respect to any and all aspects of his production of the documentary. Their contentions are out of line—based on unfounded accusations, assumptions and misstatements.

The combined motions fail to establish any non-compliance by the Filmmakers with the Second Circuit order, and utterly fail to establish any factual or legal basis for the claims of waiver and the demands for multiple forms of relief now advanced by the Individual Petitioners. As established in Filmmakers' opposition to Chevron's earlier request for similar relief—relief that is beyond the jurisdiction of this Court to grant in any event—it is high time to bring this proceeding to a close by addressing any remaining discovery needs of the Petitioners, if any truly legitimate needs remain.

---

[1] Memorandum in Support of Rodrigo Pérez Pallares' Motion for an Order Compelling Compliance with Subpoenas (Dkt. #35) at 2 (hereinafter "Pérez Mem.").

1

Having litigated fully the scope of his privilege, the Filmmakers have accepted the Court's ruling and have now produced more than 85% (450 hours) of their total outtakes. They have voluntarily turned over duplicate audio tapes requested by Chevron, provided their logs of the outtakes to assist Petitioners in making sense of them, answered many questions about the production, and corrected errors as they realized them. In response, Petitioners seek to take advantage of the few inevitable missteps by Mr. Berlinger in his efforts to comply with a large production in a short timeframe. The allegations of misconduct, bad faith and abuse are unsupported by the facts. Any dispute over the remaining discovery needs of Chevron and its lawyers should have been something the parties could resolve without the continuous filing of motion papers intended for public consumption. Particularly given Filmmakers' expressed willingness to allow *all* of the remaining outtakes to be reviewed on a confidential, non-waiver basis, the parties should be directed to negotiate any remaining discovery-related issues, and a magistrate or special master appointed in the event that any issue arises where agreement cannot be reached.

## ARGUMENT

### I.

### THE INDIVIDUAL PETITIONERS FAIL TO DEMONSTRATE NON-COMPLIANCE OR TO ESTABLISH ANY FACTUAL BASIS FOR ADDITIONAL DISCOVERY

The latest motion papers continue seriously to distort the factual record. The ongoing assertions of non-compliance and bad faith cannot withstand scrutiny.

**A.      The Individual Petitioners Wrongly Seek To Portray Mr. Berlinger as Acting in Bad Faith**

The latest motions renew and amplify assertions previously by Chevron, but in a manner so shrill and untethered to any factual record, that they should not be taken at face value. The *record facts* establish that:

2

- Filmmakers have now produced to Chevron and its lawyers a total of 446 full tapes and 16 partial tapes, out of the total 526 tapes recorded during the production of *Crude*.  Berlinger Decl. III, ¶¶ 3-10.  Just 64 tapes fell outside the scope of the Second Circuit's order, and Filmmakers have offered to allow Petitioners counsel to review even these, on a confidential, non-waiver basis, to verify their full compliance.[2]

- The 526 tapes reviewed for production constitute the entire universe of outtakes recorded by Filmmakers.  *Id.* ¶ 10.  The number of videotapes recorded is documented by a contemporaneous log maintained throughout the production of *Crude*.  And this log *also* has been voluntarily turned over to Petitioners in native, electronic format, so Petitioners can verify for themselves that no entries were altered or changed since the end of production in early 2009.  *Id.* ¶ 18.

- Filmmakers have responded promptly to questions raised and have repeatedly adjusted their schedules and sacrificed their time to satisfy the continuing demands of Chevron and its lawyers.  *Id.* ¶¶ 12-19.  They have corrected the inevitable errors and produced all tapes contemplated by the Second Circuit's order.

The ongoing effort to distort these good faith efforts by an independent third-party witness is unjustified, improper and counter-productive.

### 1.    The outtakes "regarding the criminal prosecutions."

The center of the latest request for relief is the contention that Mr. Berlinger knowingly and willfully misled the Court in a sworn declaration stating that the outtakes contained "no material regarding the criminal prosecutions in general or specifically against Messrs. Pérez and Reis Veiga."  (Berlinger Decl. I, ¶ 35.)  Mr. Berlinger's statement was overbroad and overlooked some references that the plaintiffs now cite.  There is obviously a subjective quality to identifying comments in the outtakes that the Petitioners would consider to be "regarding the criminal prosecutions," and we regard the majority of the few references they now cite as strained, but Petitioners do identify at least two passing references to potential prosecutions that the Ecuadorean plaintiffs wanted to see brought by the Government.  That Mr. Berlinger did not

---

[2] The Filmmakers also provided Chevron with a privilege log, as the Court directed, concerning the 64 withheld tapes.

recall or recognize the relevance of these references, however, does not evince bad faith or an affirmative desire to mislead. Mr. Berlinger's statement was based on his knowledge that the criminal prosecutions were never a focus of the documentary, and the collective recollection of the Filmmakers about the content of the hundreds of hours of tapes recorded years earlier.

The Individual Petitioners stretch to claim that such inconsequential comments as the statement by Plaintiffs' lawyers that "for a couple of years we've been trying to get the Attorney General . . . to do something," or that the Attorney General should be in charge of the case, as material "regarding" criminal prosecutions, and even claim that someone voicing the opinion that "what Texaco did . . . was really a crime" should have been noted by Mr. Berlinger. *See* Pérez Mem. at 9-11. They also claim that outtakes showing interactions between the independent damages expert and Plaintiffs' counsel are "regarding" their criminal prosecutions, because "Cabrera's work, of course, is one of the central foundations of the accusation against Messrs. Pérez and Veiga." *Id.* at 8. Such sophistry misconstrues the intent of Mr. Berlinger's comment and provides no evidence of either mistake or malice.

There is in fact some footage among the 450 hours of outtakes that concerns future potential prosecutions. For example, in one meeting Mr. Fajardo mentions in passing the possibility of "re-opening the [criminal] investigation." *See* Hendricks Decl., Aug. 12, 2010 at ¶28, CRS-376-03-CLIP01. Had Mr. Berlinger recognized the existence of such comments as this one, he would have tempered his statement accordingly. But, there was never any concerted effort to conceal any of this material. Even though Mr. Berlinger did not believe he had video outtakes regarding the criminal prosecutions, he volunteered—*before* the Second Circuit's ruling—to allow the Individual Petitioners to inspect those outtakes where any such comments were most likely to appear, if they had been captured at all. *See* Berlinger Dec. II, ¶ 16 and Ex.

N (annexed as Ex. AA to Berlinger Decl. IV).  And the few instances now trumpeted by the Individual Petitioners were all contained among *the very first batch* of videotapes produced to Chevron.  *See* Berglinger Decl. III, Exs. A-C (dates of delivery of outtakes).  These actions do not suggest any affirmative effort to conceal these clips.  They demonstrate the opposite.

Chevron's lawyers wrongly seek to transform an innocent error into a purposeful "effort to keep this evidence hidden."  Pérez Mem. at 20, 13.  The record does not support this claim.  Nor is there any evidence to support Mr. Pérez's assertion that Mr. Berlinger followed "Plaintiffs' direction to him to erase footage, conceal and otherwise alter the outtakes," or his suggestion that Mr. Berlinger's conduct is "dangerously close to the federal crime of misprision," an accusation hurled without a single citation to the record.  Opp. at 16 (citing 18 U.S.C. § 4).  Such accusations are particularly unwarranted and unfair coming from individuals who claim to be wrongfully accused of criminal conduct themselves.

### 2.     The total numbers of outtakes.

The Individual Petitioners attempt to suggest that some question remains about the total number of outtakes recorded during the production of the documentary.  They do not.  While rough approximations of the total number of hours of videotape were made early in this proceeding, there is no uncertainty whatsoever about the actual number of videotapes.  They are documented in a contemporaneously maintained production log, which has itself been voluntarily produced.  *See* Filmmaker Respondents' Supplemental Memorandum in Opposition to Chevron's Motion to Supplement and Enforce Subpoenas at 5 & n.4.

To suggest uncertainty, Mr. Pérez simply ignores the facts and miscites the record.  He claims that Mr. Berlinger originally said there were only 518 tapes, but the very evidence he cites shows the total to be 520.  Pérez Mem. at 17 (citing Dans Decl. Ex. 9 at 2 (describing 520 tapes)).  He then says the number was changed to 522 (*id.*, *citing* Dans Decl. Ex. 10 at 2), but

5

omits the explanation for the increase in the count that was provided by Mr. Berlinger—he discovered that in two instances entries on the log recorded *two* tapes under a single number. (*Id.,* explaining that the log contained both a 279A and 279B as well as a 445A and 445B).  The total count became 526 when four *audio* tapes included in the log were added to the count.  All of this can readily be confirmed from the contemporaneous log produced weeks ago.

### 3.      The production log.

Recognizing that the outtake log fully rebuts their effort to manufacture confusion, the Individual Petitioners attack the log itself, once again making serious accusations that are not borne out by the facts.  Mr. Pérez asserts that the log provided by Mr. Berlinger is "not the original," but one "created or altered after the filing of these Applications," Pérez Mem. at 16, but relies solely on an earlier discussion of the log by Chevron—a discussion already shown to be wrong.  Berlinger Decl. III, ¶ 18; Respondents Memorandum in Further Opposition to Chevron's Motion (Dkt. 27) at 4.

The bottom line is that the Filmmakers have voluntarily made the log available in its native, electronic format, from which it can readily be discerned that no revisions have been made since production of the film ended on January 16, 2009.  *See* Berlinger Decl. IV, ¶16, n. 4. Mr. Pérez even demands a forensic analysis of the Filmmakers' computers without providing *any* evidence that the log was altered—something the log itself would reveal.

### B.      The Individual Petitioners Wrongly Seek To Portray Mr. Berlinger as Biased and Collusive

Despite Petitioners' best efforts to suggest the contrary, the Filmmakers have no vested interest in the underlying dispute between Chevron and the Lago Agrio Plaintiffs.  During production, Filmmakers offered both sides the same terms and same considerations for their cooperation and for access, including the right to direct that the camera be turned off during

6

closed meetings if a confidential issue arose, the right to review and comment upon an early version of the documentary, and even an invitation to attend the Sundance film festival where *Crude* premiered to critical acclaim. Each side was offered the same terms and considerations in exchange for access to their meetings and events. Plaintiffs' counsel accepted broadly; Chevron largely did not. Berlinger Dec. II, ¶¶ 6-9.[3]

The whole issue of bias is a red-herring in any event, irrelevant to the legal issues before the Court concerning compliance with the Second Circuit order and the scope of the reporter's privilege. The "touchstone" for application of the journalist's privilege is not whether the person invoking it is "unbiased" because, "by that standard, few, if any, [journalists] could assert the privilege." *Schiller v. City of New York*, 245 F.R.D. 112, 119 (S.D.N.Y. 2007). The First Amendment does not require "journalists to refrain from drawing conclusions or holding opinions about the subjects on which they are reporting as a prerequisite to protection from compelled disclosure." *Wright v. Fred Hutchinson Cancer Research Ctr.*, 206 F.R.D. 679, 681 (W.D. Wash. 2002). As one federal court observed in upholding the journalist's privilege:

> The First Amendment does not favor "objective" reporting, nor is it limited to statements which contain only proven facts. The opinionated, one-sided, and issue-oriented writings found in the Federalist Papers, abolitionist newspapers, and communist dailies are all entitled to First Amendment protections, regardless of the bias of the authors.

*Wright*, 206 F.R.D. at 681 n.2.

The personal attack on the Filmmakers in both unfounded and irrelevant.

---

[3] The whole issue of bias appears to be just another litigation tactic. While not opening up to the extent that Plaintiff's did, Chevron's public relations representative remained in contact with the Filmmakers throughout production. When the film was released Chevron never objected that it was biased or failed adequately to present Chevron's positions concerning the proceeding in Ecuador.

## II.
### THE INDIVIDUAL PETITIONERS FAIL TO MEET THEIR BURDENS TO OBTAIN FURTHER DISCOVERY OR TO IMPOSE SANCTIONS

All apart from the paucity of record evidence to support the allegations of misconduct put forward by the Individual Petitioners, they completely fail to meet the legal burdens that they must carry to obtain the further relief they seek.

### A.    The Individual Petitioners Fail to Establish Any Legal Basis for Additional Discovery Under Section 1782

The Individual Petitioners ratchet up the rhetoric and demand even more intrusive disclosures than sought by Chevron.  Mr. Pérez seeks (1) wide ranging depositions "about the filming of *Crude*, the creation, maintenance and documentation of the film footage, the events observed by the movie crew during filming and subpoena compliance to date"; (2) access to "any of respondents' computers on which the original native format of the tape log was created or maintained"; and (3) production of "all documents related to instructions by plaintiffs not to film certain events or to otherwise conceal, erase or dispose of footage previously recorded."  Pérez Mem. at 21-22.  This overreaching request is defective as a matter of law, for multiple reasons.

*First*, as noted in Filmmakers' opposition to Chevron's companion motion, this Court lacks jurisdiction to entertain new requests for additional forms of relief beyond the Second Circuit's order.  Resp. Mem. in Further Opp. to Chevron Motion (Dkt. 27) at 6.  This case is presently before this Court on limited remand to resolve "[a]ny disputes related to the performance of" the July 15, 2010 Order, which directs only the production of certain outtakes.

*Second*, as demonstrated above, the Individual Petitioners provide no competent evidence of any non-compliance.  All the tapes recorded by Filmmakers have been made available for inspection as the Second Circuit ordered.

8

*Third*, even if the record warranted some further disclosure (and it does not), the appropriate remedy would be targeted discovery designed to elicit any additional responsive material. *See Treppel v. Biovail Corp.*, 249 F.R.D.111, 117-18 (S.D.N.Y. 2008) (ordering defendant to search three particular back-up email server tapes where emails produced suggested that similar relevant emails were likely to be contained on those server tapes). The Individual Petitioners' request for wide-ranging additional discovery—on topics as broad as "the filming of *Crude*" and "events observed by the movie crew"—is wildly unreasonable and should properly be denied. *See id.* at 120; *cf. McNerney v. Archer Daniels Midland Co.*, 164 F.R.D. 584, 587 (W.D.N.Y. 1995) (precluding testimony from expert witness was "too drastic" a remedy for failure to timely produce it).

**B.     The Individual Petitioners Fail to Establish Any Proper Basis For Overcoming the Journalists' Privilege**

The Individual Petitioners are equally off-base in arguing that Berlinger has somehow "given up any claim" to the reporter's privilege with regard to other material—namely, information learned under a promise of confidentiality when the cameras were turned off—by voluntarily providing Chevron's opponents in the Ecuadorean litigation with the *very same footage the Second Circuit ordered him to disclose.* Pérez Mem. at 14. Simply put, there is no "subject matter" waiver of the reporters' privilege, and with good reason.

In this Circuit, waivers of testimonial privileges are recognized only in situations where, unlike here, the privilege-holder has engaged in selective disclosure of privileged information as a self-serving litigation tactic. *See Lonegan v. Hasty*, No. 04-CV-2743, 2008 WL 41445, at *5 (E.D.N.Y. Jan. 1, 2008) ("[A]ny waiver by partial disclosure typically applies only when a party is attempting to gain some tactical advantage by a partial disclosure . . . ."). In its seminal case on the subject, the Second Circuit found no subject matter waiver of the attorney-client privilege

in circumstances where a famed criminal defendant "knew of, consented to, and actually encouraged [his] attorney . . . to write a book providing an 'insider look' into his case," had been "warned before publication that such an act might trigger a waiver and, yet, took no active measures to preserve his confidences," but instead "joined his attorney in enthusiastically promoting the book on television and radio shows." *In re von Bulow*, 828 F.2d 94, 100 (2d Cir. 1987). In *von Bulow*, the Court of Appeals observed that implied waivers of privilege are recognized to promote "fairness" in litigation and deter the "distortion of the judicial process that may be caused by the privilege-holder's selective disclosure *during litigation* of otherwise privileged information." *Id.* at 101 (emphasis added). That fairness principle simply "does not come into play" when disclosures are made outside of legal proceedings and are not placed at issue by the privilege-holder during litigation. *Id.* at 102. In such circumstances, the extrajudicial disclosure of privileged information *does not* impair the privilege-holder's right to assert the privilege with regard to any "undisclosed portions" concerning the same subject. *Id.* at 102-03. *See also In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 469 (S.D.N.Y. 1996) ("[W]e are constrained by *von Bulow* to conclude that [extrajudicial] issuance of the . . . report constitutes a waiver of the privilege only for the communications or portions of communications disclosed in the report.") (cited in Pérez Mem. at 14).[4]

In the specific context of the reporter's privilege, this principle applies with even greater force, because the Supreme Court has cautioned courts not lightly to infer waivers that would result in the surrender of First Amendment-based privileges. *See Curtis Publ'g Co. v. Butts*, 388

---

[4] The question of whether Berlinger may have waived the right to invoke the reporter's privilege in the future with regard to the *specific footage* he voluntarily disclosed to the plaintiffs—after being ordered to disclose it to the Chevron defendants—is not presented here, and Berlinger does not concede such a waiver. *See Stephens v. Am. Home Assurance Co.*, No. 91-CV-2898, 1995 WL 230333, at *4 n.17 (S.D.N.Y. Apr. 17, 1995) ("[D]isclosures in [other] litigation do not preclude [publishing company's] assertion of the reporter's privilege in this case.").

U.S. 130, 145 (1967) ("Where the ultimate effect of sustaining a claim of waiver might be an imposition on [the constitutional rights of the press], we are unwilling to find waiver in circumstances which fall short of being clear and compelling."). Moreover, unlike most testimonial privileges, which are focused on preserving the confidentiality of certain sacrosanct relationships, the reporter's privilege is recognized for reasons that go beyond preserving confidences. *See, e.g., Lonegan v. Hasty*, 2008 WL 41445, at *2 (the reporter's privilege developed "in recognition of the heavy burdens that would be placed on the press if litigants were free to rummage through journalists' files whenever a matter that had received attention in the press became the subject of litigation"); *Damiano v. Sony Music Entm't*, 168 F.R.D. 485, 499 (D.N.J. 1996) ("the issue of confidentiality is not the exclusive rationale behind the reporter's privilege," which seeks to promote other public interests).

Journalists simply do not surrender their privileges by revealing some of their work product to third parties. *See, e.g., Damiano*, 168 F.R.D. at 498-500 (journalist did not waive reporter's privilege by conducting tape-recorded interview in presence of interviewee's publicist); *J.J.C. v. Fridell*, 165 F.R.D. 513, 516-18 (D. Minn. 1995) (newspaper's disclosure that individual was not source for story did not open the door to discovery of the source's identity or unpublished information that might reveal it); *KNXV-TV v. Cooper Tire & Rubber Co.*, 178 P.3d 1176, 1182-83 (Ariz. Ct. App. 2008) (rejecting argument that news organization waived reporter's privilege "by making disclosures about the source without specifically identifying the person"). Nor is the principle any different when a reporter reveals information to a litigant. *See Holland v. Centennial Homes, Inc.*, No. 3:92-CV-1533, 1993 WL 755590, at *5 (N.D. Tex. Dec. 21, 1993) (rejecting argument that reporter tacitly waived privilege when she "intentionally inserted herself into the lawsuit").

The Individual Petitioners provide no authority that supports their contrary theory of waiver. The extensive reliance by Mr. Pérez on *In re Venezia*, 922 A.2d 1263 (N.J. 2007), is entirely misplaced (not to mention inapposite, since it is an interpretation of inapplicable state law). *See* Pérez Mem. at 14-15 & n.25. Although he quotes at length from of *Venezia*'s discussion of waiver, Mr. Pérez fails to reveal that the New Jersey court's *holding* in that case actually stands for the proposition that a reporter can be compelled to reveal otherwise-privileged information, based on a waiver theory, when the journalist already has revealed "*that same information*" to other third parties. 922 A.2d at 1274 (emphasis added). *Venezia* did not disturb the New Jersey Supreme Court's long-standing holding that a journalist's dissemination of privileged information to a third party "constitutes a waiver *only as to that specific information*" and that such a waiver "does not operate as to *any non-disclosed information*." *Maressa v. N.J. Monthly*, 445 A.2d 376, 386 (N.J. 1982) (emphasis added). *See In re Venezia*, 922 A.2d at 1272 (quoting *Maressa*). The only other waiver case cited by Mr. Pérez that addresses the reporter's privilege, *Ayala v. Ayers*, similarly found waiver only "with respect to *this same material*" that had previously been released to others. 668 F. Supp. 2d 1248, 1250-51 (S.D. Cal. 2009) (emphasis added).

Here, Mr. Berlinger did no more than produce to plaintiffs' counsel the *exact same* privileged material he was ordered to provide to Chevron. His actions, as a non-party, can in no sense be considered a selective disclosure for litigation advantage, and the disclosure is of no consequence to the Filmmakers' right to continue to assert a privilege as to *other materials or information that has not been disclosed*. In short, Mr. Pérez has failed to meet his burden of establishing that Filmmakers waived their privilege. *See Lonegan*, 2008 WL 41445, at *5 (party seeking to overcome reporter's privilege bears burden of demonstrating waiver).

12

**C.** **The Individual Petitioners Fail to Satisfy the**
**Strict Standards for Imposing Sanctions**

Attempting to bootstrap his own distortions of the record into sanctionable conduct by Mr. Berlinger, Mr. Pérez contends that statements about the absence of outtakes "regarding the criminal prosecution" were "either deliberate lies or reckless falsehoods," and asks the Court to use its inherent power to levy sanctions. Pérez Mem. at 20.[5] The request is wholly without merit.

"An award of sanctions under the court's inherent power requires both 'clear evidence that the challenged actions are *entirely without color*, and [are taken] for reasons of harassment or delay or for other improper purposes.'" *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 78 (2d Cir. 2000) (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986)) (internal quotation marks omitted) (emphasis added). *See Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 138 (S.D.N.Y. 2009) ("sanctions under the court's inherent power require a showing of bad faith or willfulness"); *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998) (same). To determine whether challenged conduct is "colorable," the Second Circuit has instructed that a court must consider "'the reasonable beliefs of the individual'" who engaged in the conduct. *Revson*, 221 F.3d at 78-79 (emphasis omitted). Bad faith may be inferred "'only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay.'" *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999) (quoting *Shafii v. British Airways, PLC*, 83 F.3d 566, 571 (2d Cir. 1996) (internal quotation marks omitted)). As discussed above, no such evidence of bad faith or improper motive exists in this case.

---

[5] Mr. Pérez references 28 U.S.C. § 1927 and Fed. R. Civ. P. 11, but makes clear that he seeks the Court to enter sanctions solely under its "inherent power." *See* Pérez Mem. at 20-21.

Mr. Berlinger's overly broad statement was made in the course of a good faith effort to protect his constitutional privilege.  Even before the issue was resolved by the Court of Appeals, he offered to allow a limited review of the outtakes to search for information relating to the criminal prosecutions, and the outtakes were promptly produced after the Second Circuit ruled— there was no effort whatsoever to hide information that would either help the Lago Agrio Plaintiffs' position or hurt Chevron.  *See* Berlinger Dec. II, ¶ 16; Berlinger Dec. III, Exs. A-C. Sanctions are not properly imposed for such innocent mistakes made in the course of litigation, including during the discovery process.  *See, e.g., Maynard v. Nygren*, 332 F.3d 462, 470-71 (7th Cir. 2003) (reversing award of sanctions for failing to provide material in discovery where no finding of willfulness); *Zambrano v. City of Tustin*, 885 F.2d 1473, 1484 (9th Cir. 1989) (vacating award of sanctions because there was "no indication in the record that counsel were guilty of anything more than simple negligence"); *see also, e.g., Velazquez-Rivera v. Sea-Land Serv., Inc.*, 920 F.2d 1072, 1076-78 (1st Cir. 1990) (vacating award of sanctions where plaintiff's conduct did not evince "purpose or bad faith").

Courts in this Circuit regularly reject demands for sanctions for the types of mistakes that occurred here.  For example, in *Williams v. Saint-Gobain Corp.*, the Western District was faced with a motion for sanctions where a party failed to produce documentary evidence.  No. 00-CV-502, 2002 WL 1477618, at *1-2 (W.D.N.Y. June 28, 2002).  The court declined to order sanctions because the party produced the materials as soon as it realized its error and there was "no evidence of any bad faith as to any withholding or destruction of same."  *Id.* at *2.  *See also Outley v. City of New York*, 837 F.2d 587, 590-591 (2d Cir. 1988) (reversing imposition of a trial sanction arising out of a good faith discovery mistake); *Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979) ("courts [should] eschew the

14

harshest sanctions" where a failure to comply "is due to a mere oversight of counsel amounting to no more than simple negligence").

Once again, none of the cases Mr. Pérez cites supports the relief he seeks.  Each involved parties and/or attorneys who, unlike here, made knowing and intentional falsehoods, perpetrated an intentional fraud on the court, or engaged in extensive patterns of vexatious litigation.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 36-42, 54-58 (1991) (sanctions against party who perpetrated "a fraud upon the court" through intentional misrepresentations); *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 112 (2d Cir. 2002) (remanding for reconsideration of sanctions where there was evidence of "a deliberate attempt to mislead" the court); *DLC Mgmt. Corp.*, 163 F.3d at 136 (2d Cir. 1998) (affirming sanctions where defendants acted in "'conscious disregard of their discovery obligations'") (citation omitted); *Sassower v. Field*, 973 F.2d 75, 78, 81 (2d Cir. 1992) (affirming sanctions against parties who engaged in "numerous instances of entirely vexatious and oppressive tactics"); *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Employees Int'l Union*, 212 F.R.D. 178, 186, 222 (S.D.N.Y. 2003) (awarding sanctions where attorneys made "aggressively willful" false statements to court); *Ametex Fabrics, Inc. v. Just In Materials, Inc.*, No. 94-CV-5226, 1996 WL 428391, at *5 (S.D.N.Y. July 31, 1996) (imposing sanctions upon finding of "bad faith" presentation of "false and misleading statements" to the court).

The record here negates the claim of bad faith advanced by the Individual Petitioners.  As previously presented, the actions taken by the Filmmakers to satisfy the legitimate needs of the Petitioners have included:

- Offering even before the Second Circuit ruled to allow the Individual Petitioners to review outtakes to look for references to criminal prosecutions.

- Reviewing hundreds of hours of outtakes and turning over nearly 85% of them promptly after the Second Circuit ruled.

- Providing 200 tapes on an expedited basis under a "claw-back" provision.

- Voluntarily surrendering a copy of the footage log.

- Voluntarily surrendering the footage log in electronic format.

- Voluntarily providing duplicate audio tapes requested by Petitioners.

- Voluntarily re-submitting tapes to Petitioners to allow them to correct their mistakes.

- Offering to allow all non-disclosed outtakes to be reviewed on a non-waiver basis.

*See generally* Berlinger Dec. III, ¶¶ 3-19; Berlinger Dec. IV, ¶¶ 16-18.  This is not a record of bad faith.  The request for sanctions should properly be denied.

### III.
### ANY LEGITIMATE DISCOVERY DISPUTES SHOULD BE REFERRED TO A SPECIAL MASTER

Cutting through the rhetoric, and even putting aside jurisdictional limitations, the Individual Petitioners advance no basis for broad-based discovery into Filmmakers' production practices, methods of operating or relationships with sources.  The only proper area for discovery under their 28 U.S.C. § 1782 Applications is into matters relevant to the foreign proceedings. *See, e.g., In re Application Pursuant to 28 U.S.C. Section 1782*, 249 F.R.D. 96, 106 (S.D.N.Y. 2008) ("proper scope of the discovery sought under section 1782, like all federal discovery, is governed by Federal Rule 26(b)"); *Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 192 (3d Cir. 1999) (same).

Since Chevron filed its most recent motion, Filmmakers have offered repeatedly to discuss directly with Chevron and the Individual Petitioners any discovery legitimately relevant to the foreign litigation.  The counter-productive motions for over-reaching relief should be denied and the parties referred to a magistrate or special master to resolve any disputes

16

concerning relevant discovery in the possession of Filmmakers. *See In re Campania Chilena de Navegacion*, No. 03-CV-5382, 2004 WL 1084243, at *1 (E.D.N.Y. Feb. 6, 2004) (district court may designate magistrate judge to determine any "pretrial matter," including petition for discovery pursuant to 28 U.S.C. § 1782); *In re Qwest Commc'ns Int'l Inc.*, No. 3:08-MC-93, 2008 WL 2741111, at *3 (W.D.N.C. July 10, 2008) (jurisdiction exists under 28 U.S.C. § 636(b) for magistrate judge, upon referral from district court, to resolve petition for discovery order pursuant to 28 U.S.C. § 1782); *In re Letter Rogatory from Local Court of Ludwigsburg, Fed. Republic of Germany*, 154 F.R.D. 196, 200 (N.D. Ill. 1994) ("[A] United States Magistrate Judge, acting as a commissioner pursuant to the Convention on the Taking of Evidence Abroad, has discretion to grant or deny a letter rogatory request for assistance in obtaining evidence [pursuant to 28 U.S.C. § 1782].").

## CONCLUSION

For each and all the foregoing reasons, Mr. Pérez's motion should be denied in its

entirety.

Dated: August 27, 2010
       New York, New York

                                          Respectfully submitted,

                                          __/s/ David A. Schulz__
                                          Lee Levine (*pro hac vice* applicant)
                                          David A. Schulz
                                          Seth D. Berlin
                                          LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
                                          321 W. 44th Street, Suite 510
                                          New York, NY 10036
                                          Tel: (212) 850-6100
                                          Fax: (212) 850-6299
                                          llevine@lskslaw.com
                                          dschulz@lskslaw.com
                                          sberlin@lskslaw.com

                                          Maura J. Wogan
                                          Jeremy S. Goldman
                                          FRANKFURT KURNIT KLEIN & SELZ, P.C.
                                          488 Madison Avenue, 10th Floor
                                          New York, NY 10022
                                          Tel:  (212) 980-0120
                                          Fax: (212) 593-9175
                                          mwogan@fkks.com
                                          jgoldman@fkks.com


                                          *Attorneys for Respondents*