UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
In re Application of

CHEVRON CORPORATION                                    10 MC 00001 (LAK)

This Document Applies to: ALL CASES
------------------------------------------------------------------- x


**MEMORANDUM OPINION**


          Appearances:


                    Randy M. Mastro
                    Scott A. Edelman
                    Andrew E. Neuman
                    GIBSON DUNN & CRUTCHER LLP
                    *Attorneys for Petitioner Chevron Corporation*


                    Maura J. Wogan
                    Jeremy S. Goldman
                    FRANKFURT KURNIT KLEIN & SELZ, P.C.
                    *Attorneys for Respondents Joseph A. Berlinger, et al.*

                    Ilann M. Maazel
                    Jonathan S. Abady
                    O. Andrew F. Wilson
                    EMERY CELLI BRINCKERHOFF & ABADY LLP
                    *Attorneys for Respondents Lago Agrio Plaintiffs*



LEWIS A. KAPLAN, *District Judge.*

          Chevron Corporation ("Chevron") is the target of litigation brought in Ecuador by

the so-called the Lago Agrio plaintiffs[1] in which the latter seek to recover over $27 billion for

---

[1]

          The Lago Agrio plaintiffs are forty-eight individuals.

alleged environmental pollution by Texaco, which was acquired by Chevron after Texaco ceased operations in Ecuador and settled environmental claims with its government.  At the suggestion of counsel for the Lago Agrio plaintiffs, Joseph Berlinger and affiliates (collectively, "Berlinger") undertook to make a documentary film about the litigation.  They were given extraordinary access by the Lago Agrio plaintiffs and ultimately released a film entitled *Crude.*

Earlier this year, Chevron and Rodrigo Perez Pallares and Richard Reis Veiga, two Chevron lawyers who now are threatened with criminal prosecution in Ecuador, applied under 28 U.S.C. § 1782 to obtain "outtakes" from the footage shot by Berlinger.  Berlinger claimed, *inter alia,* that the outtakes were subject to the journalist privilege.[2]  This Court overruled the objections and ordered production of the outtakes.[3]  While appeals remain before the Second Circuit, the Court of Appeals has directed that Berlinger "forthwith to comply with [this Court's] order to the . . . extent" of producing

> "copies of all footage that does not appear in publicly released versions of Crude showing: (a) counsel for the plaintiffs in the case of Maria Aguinda y Otros v. Chevron Corp.; (b) private or court-appointed experts in that proceeding; or (c) current or former officials of the Government of Ecuador."

It further ordered that any disputes regarding compliance with that order be resolved by this Court.[4]

The matter now is before the Court on Chevron's motion to issue additional

---

[2]  The Lago Agrio plaintiffs attempted to piggyback on Berlinger's journalist privilege claim and claimed also that the requirements of Section 1782 had not been satisfied.

[3]  *In re Application of Chevron Corp.,* ___ F. Supp. 2d ___, No. M-19-111, 2010 WL 1801526 (S.D.N.Y. May 6, 2010, corrected May 10, 2010, stay denied May 20, 2010) [hereinafter *Chevron I*].

[4]  *Chevron Corp. v. Berlinger,* Nos. 10-1918-cv, 10-1966-cv (2d Cir. filed July 15, 2010) (the "Second Circuit Order").

subpoenas to Berlinger, to resolve disputes concerning Berlinger's compliance, and to direct

Berlinger and the Lago Agrio plaintiffs to preserve evidence.

The Court assumes familiarity with its previous opinions.  It therefore suffices to

make three points briefly and then to outline the proceedings in this Court following the entry of the

Second Circuit Order.

First, the outtakes contain substantial evidence of misconduct in and relating to the

Ecuadorian litigation.  Another judge, in a ruling only last week in a related proceeding, stated with

respect to one such instance:

> "The release of many hours of the outtakes has sent shockwaves through the
> nation's legal communities, primarily because the footage shows, with unflattering
> frankness, inappropriate, unethical and perhaps illegal conduct.  In the film itself,
> Attorney Donziger brags of his *ex parte* contacts with the Ecuadorian judge,
> confessing that he would never be allowed to do such things in the United States,
> but, in Ecuador, everyone plays dirty.   The outtakes support, in large part,
> Applicants' contentions of corruption in the judicial process. They show how non-
> governmental
> organizations, labor organizations, community groups and others were organized by
> the Lago Agrio attorneys to place pressure on the new Ecuadorian government to
> push for a specific outcome in the litigation, and how the Ecuadorian government
> intervened in ongoing litigation.

> "Chevron asserts that the outtakes reveal that Respondent Kamp, along with
> E-Tech's chief scientist Maest [both consultants for the Lago Agrio plaintiffs], were
> present at a meeting with Lago Agrio's counsel, their consultants and Cabrera to plan
> Cabrera's expert investigation and report; and the meeting was held weeks before
> Cabrera was appointed as the Lago Agrio Litigation Special Master. *The footage
> shows one of the Lago Agrio Ecuadorian attorneys explaining that the Special
> Master's report will be prepared by Lago Agrio attorneys and their consultants, and
> not by the Special Master.*

> "The outtakes include a luncheon meeting with Kamp, E-Tech's chief
> scientist Maest, Charles Champ (another consultant) and Attorney Donziger. Kamp,
> Maest and Champ candidly state that the investigations show water contamination
> only at the pit sites and do not support an assertion of widespread groundwater
> contamination.

> *"Undeterred by the news that the investigation did not support claims of*

4

> groundwater contamination and the multi-billion dollar remediation costs that would
> naturally flow, Donziger tells Kamp and the chief scientist that they can
> 'extrapolate' findings of contamination at the pits to other areas, on nothing more
> than a theory. In other words, contamination of the pits could be 'extrapolated' to
> areas with no documented contamination. The admonition appears to have been
> effective, as the Cabrera Report now lists extensive water contamination and multi-
> billion dollars of remediation costs, allegedly caused by Chevron and Texaco's oil
> exploration activities."[5]

Second, as this Court previously has noted, Berlinger was invited by the Lago Agrio

plaintiffs to make *Crude* and given extraordinary access,[6] a fact amply demonstrated by the contents

of the film and the outtakes.  The Lago Agrio plaintiffs' counsel acted in his presence in the

(mistaken) belief that Berlinger could not be subpoenaed to tell what he knew or to produce his

outtakes.[7]

Third, Berlinger and his counsel, in the proceedings that led to production of the

outtakes, made representations about the contents of the outtakes that proved inaccurate.  For

example, their assertion that there was nothing relevant in the outtakes because anything of

significance wound up in *Crude*[8] is belied by the fact that over 85 percent of all of the outtakes came

within the Second Circuit's order and now, belatedly, have been produced.[9]    Likewise, only last

---

[5]

    Amended memorandum opinion and order authorizing discovery at 3-5, *In re Application of Chevron Corp.,* No. 10 MC 0021 (D. N.M. filed Sept. 2, 2010) (footnotes and citations omitted) (emphasis added).

[6]

    *Chevron I,* 2010 WL 1801526, at *11.

[7]

    As Donziger stated in one of the recently produced outtakes: "We don't have the power of subpoena in Ecuador."  Chevron Reply Ex. 3.

[8]

    Tr., Apr. 30, 2010, at 31:9-11.

[9]

    In the course of additional proceedings in this Court, Berlinger maintained that he had 520 tapes containing outtakes.  He now claims to have produced 446 of those tapes in full as well

week, Berlinger's counsel confessed that their assertions, made to the Second Circuit during oral argument, that the outtakes contained nothing relating to criminal proceedings in Ecuador were "overstatements."[10]  These and similar instances are worrisome in considering their present claims.

In all the circumstances, it is exceptionally likely that Berlinger and his associates have information that is highly relevant and that does not appear either in *Crude* or in the outtakes. Chevron's quest for discovery is no fishing expedition.

### I.    Facts

*A.    The July 20, 2010 Order*

At and after a conference on July 19, 2010, this Court established a schedule for the review by Berlinger of the 520 tapes and the production of those tapes or portions thereof required to be produced by the Second Circuit Order.[11]  It required also that Berlinger produce his original production log (as well as an annotated log that he offered to provide) and a privilege log, in a form to be prescribed, articulating any claims of privilege with respect to any responsive portions of the material that were withheld from production.[12]  On July 21, 2010, it entered a further order

---

as redacted versions of 16.  Thus, Berlinger's actions acknowledge that at least 85 percent of all of his footage is responsive to the Second Circuit Order.

[10]

Letter, Maura J. Wogan, Aug. 31, 2010, *In re Application of Chevron.*, Nos. 10-1918, 1-1966 (2d Cir. filed Aug. 31, 2010).

*See also* Berlinger Mem. [DI 44] 3-4 (admitting inaccuracy of Berlinger declaration claiming that the outtakes contained "no material regarding the criminal prosecutions in general or specifically against Messrs. Perez and Reis Veiga.).

[11]

Hendricks Decl. [DI 4] Ex. N (the "July 20 Order").

[12]

*Id.*

6

prescribing the content of the required privilege log.

B.      *Berlinger's Production and Compliance With the Orders*

Chevron concedes that Berlinger has "substantially complied" with the Second Circuit Order and this Court's July 20 order.[13]  It contends, however, that questions remain, *viz.* (1) a discrepancy between Berlinger's representation in a July 19, 2010 letter than only 36 of the 520 tapes contained nothing responsive to the Second Circuit Order and his contention in a subsequent privilege log that 83 of the tapes contain no responsive material,[14] (2) the validity of Berlinger's contention that footage revealing activities of Amazon Watch need not be produced,[15] (3) the alleged failure of Berlinger's privilege log to comply with this Court's July 21 order,[16] (4) Berlinger's failure to produce any footage shot before January 2006 despite the fact that he previously swore that he "began principal photography for *Crude* in November 2005,"[17] and (5) whether Berlinger in fact has produced his original footage log as required by this Court's July 20, 2010 order.

C.      *The Additional Discovery Requested*

Chevron seeks the issuance of five subpoenas, one to Berlinger himself and four to

---

[13]     Chevron Mem. [DI 3] 29.

[14]     *Id.* at 29-30.

[15]     *Id.* at 30.

[16]     *Id.* at 31

[17]     *Id.* at 32 (citing Berlinger Decl., Apr. 23, 2010, ¶ 15).

persons or entities affiliated with him.  The subpoenas are identical.  Each seeks the production of

the following documents:

> "1.     All COMMUNICATIONS between YOU, on the one hand, and any
> or all of PLAINTIFFS' LAWYERS AND ASSOCIATES, PLAINTIFFS'
> EXPERTS, COURT EXPERTS, or ECUADORIAN OFFICIALS, on the other hand,
> and all DOCUMENTS RELATING TO such COMMUNICATIONS.

> "2. All COMMUNICATIONS among, between, or involving any or all of
> PLAINTIFFS' LAWYERS AND ASSOCIATES, PLAINTIFFS' EXPERTS,
> COURT EXPERTS, or ECUADORIAN OFFICIALS that you received or
> OBSERVED, and all DOCUMENTS RELATING TO such COMMUNICATIONS.

> "3. All DIRECTIONS from any or all of PLAINTIFFS' LAWYERS AND
> ASSOCIATES, PLAINTIFFS' EXPERTS, COURT EXPERTS, or ECUADORIAN
> OFFICIALS to YOU, which resulted in YOU turning off YOUR cameras or
> otherwise stop taking FOOTAGE, and all DOCUMENTS RELATING TO such
> DIRECTIONS.

> "4. All OBSERVATIONS by YOU of any or all of PLAINTIFFS'
> LAWYERS AND ASSOCIATES, PLAINTIFFS' EXPERTS, COURT EXPERTS,
> or ECUADORIAN OFFICIALS during times when YOU had turned off YOUR
> cameras or otherwise stopped taking FOOTAGE, and all DOCUMENTS
> RELATING TO such OBSERVATIONS."[18]

Each seeks testimony on the following subjects:

> "1. Information sufficient to establish the authenticity of all DOCUMENTS
> produced pursuant to this Subpoena.

> "2. The subject matter of any and all DOCUMENTS identified in the
> Requests for Documents identified in Exhibit A to this Subpoena.

> "3. All COMMUNICATIONS between YOU, on the one hand, and any or
> all of PLAINTIFFS' LAWYERS AND ASSOCIATES, PLAINTIFFS' EXPERTS,
> COURT EXPERTS, or ECUADORIAN OFFICIALS, on the other hand, and all
> DOCUMENTS RELATING TO such COMMUNICATIONS.

> "4. All COMMUNICATIONS among, between, or involving any or all of
> PLAINTIFFS' LAWYERS AND ASSOCIATES, PLAINTIFFS' EXPERTS,

---

[18] Hendricks Decl. [DI 4], Exs. A-E.

COURT EXPERTS, or ECUADORIAN OFFICIALS that you received or OBSERVED, and all DOCUMENTS RELATING TO such COMMUNICATIONS.

"5. All DIRECTIONS from any or all of PLAINTIFFS' LAWYERS AND ASSOCIATES, PLAINTIFFS' EXPERTS, COURT EXPERTS, or ECUADORIAN OFFICIALS to YOU, which resulted in YOU turning off YOUR cameras or otherwise stop taking FOOTAGE, and all DOCUMENTS RELATING TO such DIRECTIONS.

"6. All OBSERVATIONS by YOU of any or all of PLAINTIFFS' LAWYERS AND ASSOCIATES, PLAINTIFFS' EXPERTS, COURT EXPERTS, or ECUADORIAN OFFICIALS during times when YOU had turned off YOUR cameras or otherwise stopped taking FOOTAGE, and all DOCUMENTS RELATING TO such OBSERVATIONS."[19]

## II.    Discussion

*A.    The Request for Additional Documents and Testimony*

In brief summary, Chevron now seeks documents and testimony from Berlinger about

1.    Berlinger's communications with (a) the Lago Agrio plaintiffs, (b) plaintiffs' and court experts, or (c) Ecuadorian officials;

2.    Communications between and among the same three groups;

3.    Directions by (a) the Lago Agrio plaintiffs, (b) plaintiffs' and court experts, or (c) Ecuadorian officials to stop filming that resulted in Berlinger stopping; and

4.    What Berlinger saw and heard after the camera was stopped.

It thus seeks to examine Berlinger as a percipient witness in contrast to its previous application, which sought access to the "outtakes" – the video Berlinger shot in the preparation of his

---

[19]    *Id.*

documentary that did not make it into the finished product – that he had created.  This request therefore raises somewhat different issues.

### 1.    Procedural Issues

Berlinger asserts that this application, to the extent it seeks additional disclosure, "is a second and separate application for discovery under 28 U.S.C. § 1782."[20]  He seeks to reserve the right to treat an order granting such disclosure "as a separate order" under that statute, presumably a reference to possible appealability.[21]

It is not entirely clear that Berlinger is correct, as the motion could be regarded in substance as an amendment or supplement to the original Section 1782 application, just as a plaintiff seeking relief in an ordinary civil action may amend or supplement the complaint.  No party, however, has suggested that anything turns on this distinction.

Berlinger, in a belated filing, claims also that this Court lacks jurisdiction to issue

---

[20]

The Lago Agrio plaintiffs make a similar assertion, arguing also that the Court has no jurisdiction over it "[u]nless it construes the . . . Motion as a § 1782 petition."  Lago Agrio Mem. [DI 15] 10.  The Lago Agrio plaintiffs, however, lack standing to object to the application, regardless of whether it is treated as a new § 1782 application, except to the extent, if any, that the application seeks material as to which they have a claim of privilege. *See, e.g., Estate of Ungar v. Palestinian Auth.,* 332 Fed. Appx. 643, 644 (2d Cir. 2009) (quoting *Langford v. Chrysler Motors Corp.,* 513 F.2d 1121, 1126 (2d Cir. 1975) ("In the absence of a claim of privilege a party usually does not have standing to object to a subpoena directed to a non-party witness."); 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 2459 (2008) ("Ordinarily a party has no standing to quash a subpoena issued to someone who is not a party to the action, unless the objecting party claims some personal right or privilege with regard to the documents sought.") (footnote omitted).

[21]

Berlinger Mem. [DI 14] 1 n.1.

additional subpoenas in light of the pendency of the appeal ordering the prior disclosure.[22]  The

contention is frivolous.  It is true of course that a district court typically is divested of jurisdiction

to "over those aspects of [a] case involved in [a pending] appeal."[23]  The short answer, however, is

that the aspect of this case involved in the pending appeal is the Court's order in *Chevron I.*  The

question whether additional subpoenas should be issued quite obviously is not at issue in the Court

of Appeals.[24]


2.      *The Section 1782 Standards*

As this Court's earlier opinion describes, a party seeking disclosure under Section

1782 must satisfy the requirements of the statute.  If it does so, the Court then exercises its discretion

in light of several pertinent factors to determine whether and to what extent disclosure should be

granted.[25]  The statutory factors all are satisfied with respect to the present application for the same

reasons set out in *Chevron I,*[26] and there is no need to repeat that analysis.  So too the first three

---

[22]

Berlinger Mem. [DI 27-2] 6.

[23]

*Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58 (1982); *United States v. Rodgers,* 101 F.3d 247, 251 (2d Cir.1996).

[24]

As noted, Berlinger argues that the present application "is a second and separate application for discovery under 28 U.S.C. § 1782."

[25]

*Chevron I,* 2010 WL 1801526, at *5.  *See also In re Application of Chevron Corp., supra* note 5.

[26]

*Chevron I,* at *5-6.

discretionary factors.[27]   The last of the discretionary factors – whether the additional disclosure sought would be unduly burdensome and intrusive – overlaps Berlinger's claim of journalist privilege.  Accordingly, the Court turns to that contention.

3.      *The Journalist Privilege Claim*

Berlinger claims that the Court should deny Chevron's request for the issuance of these subpoenas because the qualified journalist privilege applies "to all information gathered by a reporter whether through electronic recordation, such as a videotape, or through direct perception."[28]   Even assuming that a journalist's direct perceptions are subject to the qualified privilege,  which this Court views as a doubtful proposition when stated so categorically,[29] that question need not be resolved at this juncture for an important reason.  There is a fundamental difference – ignored by Berlinger – between the issuance of a subpoena, which is relief sought by the present motion, and the ultimate compulsion of the production of evidence or testimony.

As Court wrote in *Chevron I:*

"The Second Circuit 'has long recognized the existence of a qualified privilege for journalistic information.'  The privilege protects against 'the wholesale exposure of press files to litigant scrutiny,' 'the heavy costs of subpoena compliance,' and the likelihood that 'potential sources [would be] deterred from speaking to the press, or [would] insist[ ] on remaining anonymous, because of the

---

[27]

    *Id.* at *6-7.

[28]

    Berlinger Mem. [DI 14] 6-7 (quoting *Carter v. City of New York,* No. 02 Civ. 875 (RJH), 2004 WL 193142, at *1 (S.D.N.Y. Feb. 2, 2004)).

[29]

    If taken literally, the quoted language would mean that a vacationing reporter who happened to see an armed robbery or another who, in the course of covering a trial, saw a defendant threaten a witness or bribe a juror could not compelled to testify to what the reporter had seen unless the party seeking the testimony could overcome the privilege.

likelihood that they would be sucked into litigation.'"[30] It exists at least in part to protect the free flow of information to the public by, among other things, protecting the press from expensive subpoena compliance obligations, creating a disincentive to journalists' retention of perhaps valuable information, and discouraging people from providing information to journalists.[31]  Hence, where a journalist served with compulsory process establishes that the qualified privilege applies to particular documents or communications[32] and the party seeking the disclosure cannot overcome the privilege, disclosure will not be required.   But the qualified privilege does not foreclose the issuance of compulsory process to journalists or excuse them from demonstrating, in an appropriate manner, that the privilege applies to particular documents or information in question.   The word "journalist," in other words, is not an incantation that protects against the issuance of a subpoena, although a properly supported claim of privilege may well protect against the imposition of, or limit, any duty to comply with it.

The significance of this fact in the present context becomes apparent on a moment's reflection.  The specifications of the proposed subpoenas call for information in Berlinger's files or ken about communications within, between or among four different groups of people (Berlinger, counsel for the Lago Agrio plaintiffs, certain experts, and Ecuadorian officials), including requests

---

[30] *Chevron I,* at *8 (quoting *Gonzales v. Nat'l Broadcasting Co.,* 194 F.3d 29, 32, 35 (2d Cir. 1999) (footnote omitted)).

[31] *Gonzales,* 194 F.3d at 35.

[32] The burden of doing so is on the person claiming the privilege.  *Chevron I,* at *8-9 (citing *von Bulow v. von Bulow,* 811 F.2d 136, 145-46 (2d Cir. 1987)).  As will appear, the putative journalist must claim the privilege by describing the nature of the documents and/or communications in question, without disclosing their contents, in a manner that enables an adverse party and the Court to assess the claim.

that Berlinger stop filming, and Berlinger's observations of people in three of those groups during times when his cameras had been stopped pursuant to request.  Each communication or event that comes within the subpoenas' terms, and the circumstances in which it occurred, quite likely varies considerably from others in ways highly relevant to the assessment of Berlinger's claim of privilege with respect to each.  Some communications may have been made in confidence while others were not.  Some may be known to others whose evidence should be sought, at least in the first instance; others may be known only to Berlinger.  Some events or communications may be highly relevant while others may be of little or no importance to matters concerning which Chevron has a legitimate basis for disclosure.  Other examples will come readily to mind.  And the situation quite likely is the same with respect to requests to stop filming.  The fundamental point is that without knowing more about the particulars of the individual documents and events as to which Berlinger claims privilege, it is impossible to make an informed determination as to whether in fact the elements of the privilege have been made out, let alone to permit Chevron to seek to overcome any such privilege, as is its right.  In other words, the effect of accepting Berlinger's blanket claim that every responsive document he has and everything he saw and heard while working on this documentary is privileged *and that a subpoena therefore should not issue* would transform what the Second Circuit repeatedly has made clear is a qualified privilege into an absolute privilege for any and all information Berlinger may possess.  Nevertheless, Chevron's request must be addressed with sensitivity to the concerns that underlie the privilege lest the process of fleshing out and testing the privilege claims itself reveal the allegedly privileged material or impose an unjustified burden without an informed judicial determination that such revelation or effort is warranted.

A starting point for doing so is differentiating between the subpoena specifications seeking production of documents and the requests for subpoenas to take depositions of Berlinger

and his associates as percipient witnesses.  There is a well established method for the invocation of alleged privileges in response to subpoenas and other demands for tangible evidence.  Those in possession, custody or control of allegedly privileged documents called for by subpoenas and document requests are obliged to enumerate the documents as to which they claim privilege and assert their privilege claims in the manner prescribed by FED. R. CIV. P. 26(b)(5)(A) and S.D.N.Y. CIV. R. 26.2.  Berlinger has advanced no persuasive reason why he should not be compelled to claim privilege with respect to documents and things in the same manner as any other litigant[33] – providing a privilege log enumerating the documents as to which privilege is claimed and including as to each such information as may be necessary to make out his claim of qualified journalist privilege.[34]  Indeed, in responding to the previous subpoenas, which sought outtakes from *Crude,* he did just that without objection.  Doing so here would enable the Court to rule on the privilege claims with respect to documents on an appropriate record.

Like the sweeping claims of privilege with respect to whatever responsive documents may be in his possession, Berlinger's blanket claim of privilege with respect to Chevron's attempt to obtain testimony about what he and his affiliates saw and heard is at best premature.  He and his associates have provided extremely little, if any, information about what they saw and heard or the circumstances in which that occurred.  He most assuredly has not established that literally everything he and his associates observed that comes within the subjects for examination that are

---

[33]  Among other things, Berlinger has not claimed that the volume of responsive documents is so great that the burden of enumerating them and making particularized claims of privilege with respect to each would be unreasonable.

[34]  FED. R. CIV. P. 26(b)(5)(A); S.D.N.Y. CIV. R. 26.2.  *See generally* 24 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5507, at 569 (2007).

described in the proposed subpoenas is within the alleged privilege, whether for confidential or non-confidential information.[35]   He has not established that everything that Chevron seeks here is available from other sources.  He surely cannot claim that there is no basis for believing that a good deal of what he and his affiliates know is relevant; for reasons already discussed in *Chevron I* and reinforced by the contents of the outtakes thus far disclosed, it is quite plain that Berlinger was given extraordinary access and witnessed a good deal that is highly relevant.[36]   In short, he has not provided enough information to enable Chevron to challenge his claims with respect to particular matters, an opportunity to which it is entitled.

The extraordinary nature of Berlinger's claim that he and his associates cannot be subjected to deposition, even to test largely conclusory and certainly overbroad claims of privilege, is evident by comparing this position to that of one claiming attorney-client privilege, a privilege which, unlike the journalist privilege, is absolute in the sense that it is not overcome even by a

---

[35]

Berlinger concedes that at least some of the information Chevron seeks is not confidential. Berlinger Mem. [DI 14] 6 ("The Requested Discovery Includes Confidential and Non-Confidential Information").  His claim that there were confidential communications, which this Court previously rejected, albeit on a somewhat more slender record, *see Chevron I,* 2010 WL 1801526, at *8-9, does not appear to be materially stronger on the present record, although the Court does not now make that determination.  The fact that someone present at a particular event may have asked Berlinger to turn off his video camera by no means establishes that there was an agreement that Berlinger would maintain in confidence whatever he then saw or heard, that there was an understanding that whatever then may have been said would be "off the record," that whatever then took place was in any sense private to Berlinger and the person who made the request, or that any privilege based on confidentiality has not been waived.  Among other things, whatever took place may have occurred in the presence of persons who were not within the scope of the alleged privilege. Even if that were not so, Berlinger may have disclosed the information and thus waived any privilege.  Indeed, he recently has disclosed some of the outtakes to the Lago Agrio plaintiffs although he was under no compulsion to have done so, Letter, Maura J. Wogan, Aug. 9, 2010, *In re Application of Chevron.,* 10 MC 00001(LAK), an act which, depending upon the facts, may have constituted a waiver.

[36]

*Chevron I,* 2010 WL 1801526, at 11.

compelling showing of need.  Where a party seeks disclosure from a witness who may have relevant information concerning allegedly privileged attorney-client communications, the fact that the witness may be asked questions that call for information as to privileged communications does not protect a witness from being deposed or called to testify at a trial or before a grand jury.[37]  Rather, the witness must appear and give testimony.  When a question seeking disclosure of allegedly privileged material is posed, however, the holder of the alleged privilege may object and delay disclosure until a court rules on the objection.  When an objection is made, however, the party seeking disclosure nevertheless is entitled to discover the dates and places of and the identities of the participants in the communications, the identities of others who were present and to whom the communications were disclosed, and the general subject matter (but not the content) of the communications.[38]  This permits the party seeking disclosure and, if need be, the court to know which communications are at issue, something about their general nature, whether they in fact were confidential, and whether any privilege has been waived by disclosure of the contents of the communications to persons other than the attorney and client.  Once such a record is developed, the court rules on the objection.

The attorney-client privilege paradigm makes a good deal of sense in the present context.  Nevertheless, there are two possible differences between the usual attorney-client privilege situation and this one.

First, the party seeking disclosure of evidence allegedly protected by the attorney-

---

[37]   *See* 24 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5507, at 567 (2007) ("One cannot assert the privilege by a blanket refusal to testify; there must be specific objection to particular questions calling for privileged information.").

[38]   *See* FED. R. CRIM. P. 26(b)(5)(A); S.D.N.Y. CIV. R. 26.2.

client privilege may know with some specificity the subject matter of interest and therefore usually can frame questions that go quickly to the heart of the matter.  Here, on the other hand, Berlinger and his associates spent considerable time in Ecuador and elsewhere observing and, in some cases, recording a variety of statements and events related to the Lago Agrio litigation and those involved in or concerned with it.  Identifying the particular communications and events that Chevron claims are significant could take time.

Second, it is possible that identifying the pertinent events or communications in unsupervised depositions with sufficient specificity to evaluate the privilege claim without disclosing allegedly privileged material would lead to unnecessary disputes and delays, particularly likely in light of the lack of reasonable compromise and accommodation among counsel that has characterized this litigation to date.

Given these concerns, the Court will not at this stage permit unsupervised depositions or allow Chevron to inquire into whatever it may wish.  It therefore adopts the following measures to protect Berlinger's legitimate interests and, at least for now, confine the inquiry to the heart of the matters as to which Berlinger and his associates are highly likely to have relevant knowledge that is not already fully disclosed in the outtakes produced previously:

1.    For the present, the depositions shall be limited to the following subjects:

a.    Observations of "(a) counsel for plaintiffs in the case of *Maria Aguinda y Otros v. Chevron Corp.;* (b) private or court-appointed experts in that proceeding; or (c) current or former officials of the Government of

Ecuador."[39]

        b,.     Sufficient information concerning any such observations as to which privilege is claimed to avoid disclosure thereof as to (1) identify such observations, and (2) evaluate any such claims of privilege.

        c.     Compliance with the subpoenas previously issued.

        2.     The depositions shall be presided over by a special master to be appointed by this Court.  The special master shall rule on objections and make such findings of fact and conclusions of law as may be appropriate to that end.  The special master is authorized to direct witnesses to answer questions.  In the event the special master directs a witness to answer a question as to which privilege is claimed and the objector wishes to seek review from this Court, the question need not be answered pending this Court's ruling.  The deposition, however, shall be completed subject to rulings before review by this Court is sought unless this Court for good cause elects to entertain such review at an earlier point.  This Court's review of privilege rulings by the special master and the facts upon which they are based shall be *de novo.*  The fees and expenses of the special master shall be borne by Chevron, provided, however, that Berlinger and anyone else participating in the depositions may be required to share in those costs if their conduct warrants.  The parties are urged to cooperate with a view to resolving this matter quickly, economically and efficiently.

---

[39]    Order, *In re Application of Chevron Corp.,* Nos. 10-1918, 10-1966 (2d Cir. filed July 15, 2010).

B.      *The Issues Relating to Berlinger's Production to Date*

Chevron's motion seeks an order "compelling Respondents to provide the original footage log, to provide a complete privilege log describing the contents of all the segments they have withheld as ordered by this Court on July 21, 2010, and to produce any and all remaining footage that shows (a) any of Plaintiffs' attorneys and consultants or their associates, (b) any court-appointed or private experts, and/or (c) any current or former Ecuadorian governmental officials, as ordered by the Second Circuit on July 15, 2010."  While Chevron concedes that Berlinger has "substantially complied" with the Second Circuit Order and this Court's July 20 order,[40] it questions whether Berlinger in fact has produced his original footage log as required by the July 20 order, whether his privilege log complies with this Court's July 21 order, and his failure to produce any footage shot before January 2006 despite the fact that he previously swore that he "began principal photography for *Crude* in November 2005."[41]

On August 6, 2010, three days after Chevron filed this motion, Berlinger produced to Chevron (1) his original footage log in native electronic format, (2) five back-up audio tapes, (3) one tape previously designated by Berlinger as "missing" and three tapes previously designated as "DNE" ("Does Not Exist") and (4) a revised privilege log indicating that the tapes designated "missing" and "DNE" were nonresponsive.[42]  He asserts that his filming of *Crude* in fact began in

---

[40]     Chevron Mem. [DI 3] 29.

[41]     *Id.* at 32 (citing Berlinger Decl., Apr. 23, 2010, ¶ 15).

[42]     Berlinger Decl., Aug. 10, 2010 [DI 13] ¶¶ 6-9; Chevron Reply Mem. 3.

January 2006 and that "[a]ny statement that shooting began in November of 2005 is a mistake."[43]

In total, Berlinger has produced to Chevron 446 tapes in full and 16 tapes in partially redacted

form.[44] The revised privilege log identifies the 64 full tapes and the 16 partially redacted tapes

withheld from production.[45]  Thus, Berlinger has accounted for all 526 tapes identified in his original

privilege log.[46]  In addition, he has offered to permit petitioners to review all undisclosed outtakes

on a non-waiver basis.[47]

Chevron rejoins that Berlinger's production after the filing of its motion raises new

questions concerning the completeness of Berlinger's compliance with the orders of the Second

Circuit and this Court and asks that Berlinger be directed to supplement his "inadequate" privilege

log and to produce footage (a) listed under the heading "Archival Footage" in a log first produced

after Chevron made this motion or (b) depicting representatives of Amazon Watch.  Berlinger,

however, asserts that the "Archival Footage" is the work of "third part[ies]" and therefore is not

responsive.[48]   He maintains also that Amazon Watch is a "charitable[,] non-governmental

organization operating in multiple countries," rather than a member of plaintiffs' counsel.[49]  Finally,

---

[43]

Berlinger Decl., Aug. 10, 2010, ¶ 17.

[44]

*Id.* ¶ 10.

[45]

*Id.*

[46]

*Id.*

[47]

Berlinger Mem. [DI 44] 16.

[48]

Berlinger Decl., Aug. 10, 2010, ¶ 17.

[49]

*Id.* ¶ 14.

Chevron's argument that the privilege log is "inadequate" rests on the assumption that it does not "identify each segment, but instead provides only general description of the subject matter of each tape."[50] Berlinger explains that "each tape that was redacted involved only a single redaction–either the material at the beginning or at the end of the tape.  Thus, there are no multiple redacted 'segments' requiring separate descriptions."[51]

In consequence, Chevron's contentions that Berlinger has not complied with the orders of the Second Circuit and this Court either have been rendered moot in view of Berlinger's August 6, 2010 production or appear to have been refuted save the issue concerning Amazon Watch.[52] Chevron may examine Berlinger in the forthcoming depositions concerning facts bearing on whether outtakes depicting representatives of Amazon Watch were within the scope of the orders of July 19 and 20, 2010.  Its contention that Amazon Watch's relationship with counsel for the Lago Agrio plaintiffs warrants production under those orders is referred to the special master to hear and report.

C.    *Preservation Order*

Berlinger consents to Chevron's request for an order requiring the parties "to preserve all potentially relevant evidence, including electronic evidence."  The Lago Agrio plaintiffs, however, object, at least to the extent that the requested order would apply to them in their own

---

[50]

Chevron Mem. 31.

[51]

Berlinger Decl. ¶ 16.

[52]

Chevron may renew its application with respect to production pursuant to the Second Circuit Order if, after reviewing the previously undisclosed outtakes pursuant to Berlinger's offer, it believes that there is a basis for doing so.

right.[53]  They contend that the Court lacks authority to "issue a preservation order to anyone not the subject of the operative § 1782 application."[54]  They object also that the Lago Agrio plaintiffs and others who would be reached by the order are in Ecuador and thus beyond the Court's power.[55]

The latter contention is speedily dispatched.  Despite the fact that Chevron sought no relief from them in this proceeding, which simply requested an order requiring Berlinger to produce the outtakes, the Lago Agrio plaintiffs engaged U.S. counsel and voluntarily appeared here. In substance, they intervened in Chevron's Section 1782 proceeding against Berlinger.[56]  By doing

---

[53]

Of course, any preservation order directed to Berlinger would bind Berlinger and his affiliates and anyone in "active concert or participation with" them.  FED. R. CIV. P. 65(d)(2)(C).  This would include the Lago Agrio plaintiffs and their attorneys, among others, if they were in active concert or participation with Berlinger and/or any of his affiliates.  The issue therefore is whether the Court should issue an order that would be binding on the Lago Agrio plaintiffs and their attorneys, etc., even if they were not in active concert or participation with Berlinger.

[54]

Lago Agrio Mem. [DI 15] 12.

[55]

See id. 12-13.

[56]

While § 1782 does not provide the manner by which applications pursuant to its terms are made, Rule 1 of the Federal Rules of Civil Procedure states in relevant part that the Civil Rules "govern the procedure . . . in all suits of a civil nature . . . with the exceptions stated in Rule 81."  It seems quite likely that a § 1782 proceeding is a suit "of a civil nature" governed by the Civil Rules.  See, e.g., Fed. Reserve Bank of Atlanta v. Thomas, 220 F.3d 1235, 1239 (11th Cir. 2000) (quoting Weems v. McCloud, 619 F.2d 1081, 1087-90 (5th Cir. 1980) ("The phrase 'suits at common law and in equity' embraces not only ordinary actions and suits, but includes all the proceedings carried on in the ordinary law and equity tribunals as distinguished from proceedings in military, admiralty, and ecclesiastical courts. It is a very comprehensive term, and is understood to apply to any proceedings in a court of justice by which an individual pursues a remedy which the law affords.") (internal quotation marks omitted).  Accordingly, the Lago Agrio plaintiffs' right to be heard in Chevron's proceeding against Berlinger depended upon their having intervened, whether de facto or de jure. Moreover, even if the Civil Rules do not apply here, the principle nevertheless governs by analogy.  The Lago Agrio plaintiffs have participated in this proceeding in a manner entirely comparable to that in which a stranger to an ordinary civil action between two groups of litigants sometimes is heard as an intervenor.  The substance of the situation demands that they be treated in the same way.

so, they subjected themselves to the personal jurisdiction of this Court.[57]  They are subject to such orders as the Court may issue regardless of whether that would have been so had they not injected themselves into this dispute between Chevron and Berlinger.

The contention that the Court in any case lacks authority to issue a preservation order against the Lago Agrio plaintiffs because they were not the persons from whom this Section 1782 proceeding sought discovery also is extremely doubtful for the same reason.  But it ultimately is unnecessary to decide that point.

While courts almost certainly have inherent authority to order those before them to preserve potentially relevant evidence, that authority ordinarily should not be used in the absence of some substantial basis for believing that it would serve a useful purpose.[58]  While Chevron has accused the Lago Agrio plaintiffs (or, more specifically, certain of their attorneys) of various forms of misconduct, it has adduced no proof of any actual or threatened destruction of evidence. Moreover, the Lago Agrio plaintiffs and their attorneys would be subject to the risk of serious adverse consequences were that to occur.  The "knowing destruction or disposal of evidence in the face of prospective litigation may constitute a criminal offense."[59]  Moreover, their attorneys, at least

---

[57]

> *County Security Agency v. Ohio Dep't of Commerce,* 296 F.3d 477, 483 (6th Cir. 2002); *United States v. State of Oregon,* 657 F.2d 1009, 1016 n.18 (9th Cir. 1981); *United States v. Asay,* 614 F.2d 655, 662 (9th Cir. 1980); *T-H Assocs. v. Simons,* No. 84 Civ. 9252 (MJL), 1985 WL 1902, at *2 (S.D.N.Y. July 5, 1985); *City of Santa Clara, Cal. v. Kleppe,* 428 F. Supp. 315, 317 (N.D. Cal. 1976), *aff'd in part, rev'd in part on other grounds sub nom. City of Santa Clara, Cal. v. Andrus,* 572 F.2d 660 (9th Cir. 1978); 7C CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE; CIVIL 3D § 1920 (2007).

[58]

> *See, e.g., Asset Value Fund Ltd. P'ship v. Find/Svp, Inc.,* No. 97 Civ. 3977 (LAK), 1997 WL 588885 (S.D.N.Y. Sept. 19, 1997).

[59]

> *Id.* (citing *United States v. Solow,* 138 F. Supp. 812, 815 (S.D.N.Y.1956) (Weinfeld, J.)).

those licensed in this country, would risk their professional licenses if they engaged in such behavior.

In all the circumstances, the Court declines in the exercise of discretion to enter a preservation order against the Lago Agrio plaintiffs.

D.     *Berlinger's Cross Motion*

As noted, the Second Circuit Order restricted use of materials produced thereunder to "litigation, arbitration, or submission to official bodies, either local or international."  Berlinger claims that Chevron has violated that order.  In particular, he claims that (a) a post concerning Chevron's August 3, 2010 motion, including its allegations based on outtakes produced pursuant to the Second Circuit Order, appeared on a National Association of Manufacturers ("NAM") web site, and (b) Chevron posted a link to the NAM post, in each case before Berlinger's counsel were served with Chevron's papers.  In addition, it complains that (c) a *San Francisco Chronicle* article two days later reported that Chevron had supplied it with transcripts of some of the outtakes, and (d) another web site reported that Chevron had encouraged others to go to the courthouse and get a copy of a DVD containing some of the outtakes that Chevron had filed in support of its motion. Berlinger asks that this Court order Chevron to comply with the Second Circuit Order.[60]

As an initial matter, there is irony in Berlinger's application.  On the one hand, he has resisted production of his outtakes, and resists the discovery that Chevron now seeks, by

---

[60]      In ordinary circumstances, it would not be for a district court to enforce an order of a court of appeals.  Any willful violation of such an order could be a contempt of that order without regard to anything that a district court might do.  Nevertheless, as the Second Circuit Order specifically provides that "[a]ny disputes related to the performance of this order shall be directed to the district court for resolution," the cross-motion is properly before me.

invoking the Free Press Clause of the First Amendment.  Yet he seeks to prevent Chevron from publicly discussing litigation taking place on the public record.  The First Amendment, however, protects Chevron's right to speak about this litigation at least to the same, and probably to a greater, extent than it protects Berlinger's desire to avoid giving evidence in court like any other citizen.  But Berlinger's cross-motion fails for reasons having nothing to do with the First Amendment.

The centerpiece of Berlinger's claim that Chevron violated the Second Circuit Order is this assertion:

> "•   On August 3, 2010 at 7:47 p.m., more than two hours before Chevron served its motion papers on counsel for the Filmmakers, a thorough article entitled "'*Crude*' Footage Reveals Lies Behind Trial Lawyers' Suit Against Chevron' was posted on the blog of the National Association of Manufacturers.
>
> •   On August 3, 2010, at 8:06 p.m., approximately two hours before Chevron served its motion papers on counsel for the Filmmakers, Chevron posted "'Crude'" Footage Reveals Lies Behind Trial Lawyers' Suit Against Chevron' to its Twitter.com page and linked to the above-referenced article."[61]

The allegation is that Chevron must have given the author "an advance copy of its" motion papers before they were filed in this Court and thus in violation of the Second Circuit Order.[62]  But that implication is not borne out by evidence.  Indeed, the record in this case demonstrates that the author of the blog post quite readily could have obtained Chevron's memorandum from the public docket of the Court.

This Court uses an electronic filing system in which lawyers in most cases, including this one, file their "papers" electronically.  The "papers" are publicly available immediately upon

---

[61]   Berlinger Mem. [DI 14] 15-16 (footnotes omitted).

[62]   *Id.* 3.

filing.[63]   In this instance, Chevron filed its motion and memorandum of law, which contains the description of the outtakes that is referred to in the blog post, at 5:39 p.m. EDT on August 3, 2010, at least two hours and eight minutes before the alleged time of the blog post.[64]   Indeed, the NAM blog post, at least as of August 15, 2010, linked to an image of Chevron's memorandum of law that bears the case and docket item numbers and filing date automatically affixed by the Court system, thus establishing (assuming that the image in the link was not changed in the interim) that the image was created after the filing of Chevron's motion.   In short, Berlinger has not even remotely approached proving that Chevron gave the author its papers, let alone any outtakes, before they were a matter of public record.   Indeed, he has offered no evidence that Chevron even alerted the author to the filing of the papers.[65]

Even if Chevron had alerted the author of the blog post or others to its filing, there would have been no violation of the Second Circuit Order.   During the argument before the Second Circuit, Berlinger asked that court to limit Chevron's use of materials produced pursuant to its order to officials proceedings and to prevent it from using them "as part of their PR campaign."   While the issue was discussed somewhat extensively,[66] the order the Circuit issued did not adopt

---

[63]

The times of these events are electronically recorded in real time.

[64]

It should be noted that Berlinger has provided no evidence to support the alleged time of the blog post as 7:47 EDT.  The two hour figure, moreover, assumes, for the sake of argument, that the blog post was made at 7:47 p.m. EDT as opposed, for example, to Central, Mountain or Pacific Daylight Savings Time, which would have been even later on East Coast Time.

[65]

Berlinger's memorandum states, without citation of authority, that the author "admits to being a paid blogger for Chevron."  Berlinger Mem. [DI 14] 16 n. 8.  But he has submitted no such evidence and cited no source supporting the allegation.

[66]

Henricks Decl. [DI 22] Ex. 10, at 62-67.

Berlinger's suggestion. It limited only the use of the "[m]aterial produced under [its] order" – that is, the outtakes themselves. It did not restrict either side from discussing the litigation in public or from drawing the attention of the media to public filings. Both quite obviously have done so.

There remains for consideration only Berlinger's reference to a *San Francisco Chronicle* article in which the author allegedly said that "The Chronicle reviewed transcripts of the outtakes, supplied by Chevron." Berlinger's implication is that Chevron violated the Second Circuit Order by supplying transcripts of material produced thereunder.

Berlinger's charge amounts to an allegation of civil contempt of the Second Circuit Order. He therefore is obliged to establish his charge by evidence that "is clear and convincing."[67] A newspaper clipping stating that Chevron provided transcripts of outtakes is not admissible to prove the truth of the statement and certainly not clear and convincing evidence. Even if it were, the import of the article appears to be quite different from what Berlinger claims.

While Berlinger has not supplied the Court with the article upon which he relies, his memorandum contains a URL for an electronic version.[68] Assuming that the article at that URL is the same as that to which he referred, however, it appears that the transcripts referred to were those included in Chevron's motion papers.[69] There was nothing wrong with the reporter referring to those transcripts on the public record or, for that matter, with Chevron bringing his attention to them or even providing him with copies of motion papers that it previously had filed with the Court.

---

[67]
       *Latino Officers Ass'n v. City of New York,* 558 F.3d 159, 164 (2d Cir. 2009).

[68]
       http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2010/08/05/BUMH1EP2BF.DTL   (last visited Aug. 16, 2010).

[69]
       Hendricks Decl [DI 4] ¶¶ 7-9 & Exs. F, G at 191-00-03, 189-00-02, 196-00.

28

In short, Berlinger has not proved any violation of the Second Circuit Order.

*Conclusion*

For the foregoing reasons, Chevron's motion [DI 2] is granted to the extent that

1.      Berlinger shall preserve all potentially relevant evidence, including electronic evidence.

2.      The Clerk shall issue subpoenas to Berlinger and his four affiliates requiring (a) the production by them of the documents and things described in the proposed subpoenas submitted with Chevron's motion, and (b) that they appear for and testify at depositions by Chevron with respect to the subjects identified in paragraphs 1 and 2 of the proposed subpoenas and at pages 6 and 7 of this Memorandum Opinion.

It is denied in all other respects.

Berlinger's cross-motion [DI 11] is denied in all respects.

SO ORDERED.

Dated:      September 7, 2010

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)